# 24-1061-cv

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



MCGM, Gмвн,

*Plaintiff-Appellant,*

Management Consulting Group, Gмвн,

*Plaintiff,*

*v.*

Opta Group LLC, Jeff Stone, Oliver Maier,
Opta Minerals, Inc., Speyside Equity 1 LP,

*Defendants-Appellees,*

*(Caption Continued on the Reverse)*

———————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

Richard Schager, Jr.
Jared Stamell
Stamell & Schager, LLP
*Attorneys for Plaintiff-Appellant*
260 Madison Avenue, 16th Floor
New York, New York 10016
212-566-4047



SPEYSIDE EQUITY LLC, SPEYSIDE EQUITY FUND LLP,
JOHN AND JANE DOE 1-99, KAY MICHEL, KEVIN DAUGHERTY,
SPEYSIDE PRIVATE FUND ADVISERS LLC, SPEYSIDE PRIVATE FUND LLP,

*Defendants.*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff, MCGM GmbH is a privately held German company.  It has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTION.........................................................................................1

STATEMENT OF ISSUES PRESENTED...................................................2

STATEMENT OF THE CASE...................................................................3

    A Company in Munich....................................................................4

    The Rights of Shareholders............................................................5

    CEO Michel and the shares which were not issued..........................6

    Fraud and Conspiracy ....................................................................6

    The Insolvency Proceedings .........................................................10

STANDARD OF APPELLATE REVIEW................................................11

SUMMARY OF THE ARGUMENT .......................................................12

ARGUMENT ...........................................................................................14

    1.  Plaintiff Properly Pleaded Fraud Against SKW's
       Management and Opta as Co-Conspirators ..............................14

          a.  Pleading Rules...............................................................14

          b.  Primary Tort for the Conspiracy ......................................15

          c.  The Co-Conspirators .......................................................17

          d.  Fraudulent Statements ....................................................20

    2.  Plaintiff Properly Pleaded a Claim for Promissory Estoppel ...................23

3.  Plaintiff Properly Pleaded a Claim for Fraudulent Conveyance ....................................................................33

4.  Conversion Was Properly Pleaded............................36

5.  Leave to Amend .......................................................39

CONCLUSION ..............................................................................40

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)....................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abelar v. IBM (In re IBM Arb. Agmt. Litig.)*,
   76 F.4th 74 (2d Cir. 2023) .................................................................14

*Acacia Investments v. West End Equity I*,
   2020 N.Y. Misc. LEXIS 686 (N.Y. Sup., N.Y. Co. 2018)..........................34, 35

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
   626 F.3d 699 (2d Cir. 2010) ..............................................................40

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................11, 12, 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................11

*BNHC 1703-518 v. Venari Partners*,
   2024 N.Y. Misc. Lexis 4778 (N.Y. Co. 2024) ..................................36

*Calamia v. City of New York*,
   879 F.2d 1025 (2d Cir. 1989) ............................................................38

*Carbon Investment Partners v. Bressler*,
   2021 U.S. Dist. LEXIS.166293 (SDNY 2021)....................................35

*City of Long Beach v. Agostisi*,
   220 A.D.3d 776 (2d Dep't 2023).................................................14, 16

*Clifford R. Gray v. LeChase Constr. Svcs*,
   31 A.D.3d 983 (3d Dep't 2006)........................................................24

*Cohen Bros. Realty v. Mapes*,
   1181 A.D.3d 401 (1lst Dep't 2020)..................................................14

*Colavito v, New York Organ Donor Network*,
   8 N.Y.3d 43 (2006) ..........................................................................37

*Cortec Indus., Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991) ........................................................................39

*dMY Sponsor v. Glatt*,
   2024 N.Y. Misc. LEXIS 1622 (N.Y. Sup., N.Y. Co. 2024) ..............................37

*Eurycleia Partners v. Seward & Kissel*,
   12 N.Y.3d 553 (2009) ..........................................................................14, 34

*Fat Brands v. Ramjeet*,
   75 F.4th 118 (2d Cir 2023) ......................................................................12

*FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.*,
   498 U.S. 269 (1991)................................................................................1, 2

*Hecht v. Commerce Clearing House*,
   897 F.2d 21 (2d Cir. 1990) .....................................................................15

*IWA Forest Industry Pension Plan v. Textron*,
   14 F.4th 141 (2d Cir. 2021) ....................................................................11

*Leneau v. Ponte*,
   No. 16-CV-00776 (GHW), 2018 WL 566456 (SDNY 2018) ........................39

*Leon v Martinez*,
   84 NY2d 83, 638 NE2d 511, 614 NYS2d 972 (1994) .................................39

*Littlejohn v. City of New York*,
   795 F.3d 297 (2d Cir. 2015) ..............................................................19, 24

*Maryanne McKeown (Frederick) v. Frederick*,
   39 Misc.3d 1241(A) .................................................................................25

*Moniodes v. Autonomy Capital (Jersey) LP*,
   No. 20-CV-05648 (GHW), 2021 WL 3605385
   (S.D.N.Y. Aug. 11, 2021) .........................................................................39

*Nguyen v. FXCM Inc.*,
   364 F. Supp. 3d 227 (S.D.N.Y. 2019) .......................................................11

*Outlaw v. Airtech Air Conditioning & Heating, Inc.*,
   412 F.3d 156 (D.C. Cir. 2005)....................................................................1

*Schroeder v. Pinterest Inc.*,
    133 A.D.3d 12 (1st Dep't 2015) ...........................................................24

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000) ...................................................................12

*United States v. Chow*,
    993 F.3d 125 (2d Cir. 2021) .................................................................12

*United States v. O'Hagan*,
    521 U.S. 642 (1997)..............................................................................18

*William Ng v. Steven Ng*,
    2014 N.Y. Misc. 631 (N.Y. Sup., N.Y. Co. 2014) ...........................38

**Statutes**

28 U.S.C. § 1291 ..........................................................................................1

28 U.S.C. § 1332(d)(2)..................................................................................1

Debtor and Creditor Law Article 10

    § 270...............................................................................................33, 35

    § 273.....................................................................................................34

    § 274.....................................................................................................35

    § 276.....................................................................................................34

**Rules**

Federal Rules of Civil Procedure 9 .............................................................13

Federal Rules of Civil Procedure 9(b) ........................................................14

Federal Rules of Civil Procedure 12(b)(6) .................................................11

Federal Rules of Civil Procedure 54(b) ...................................................1, 2

Rule 4(a)(2) ...............................................................................................1, 2

Rule 8(a)......................................................................................................15

**Other Authorities**

German Federal Financial Supervisory Authority
    https://www.bafin.de/EN/Aufsicht/BoersenMaerkte/Transparenz/
    Informationspflichten_fuer_Emittenten/informationspflichten_
    fuer_emittenten_node_en.html ................................................................6

German Stock Corporation Act (AktG),
    https://www.gesetze-im-internet.de/englisch_aktg/
    englisch_aktg.html ................................................................................6

Speyside Equity, news article on Article 30, 2023,
    "Speyside Completes Continuation Vehicle OPTA" ........................................8

## JURISDICTION

Jurisdiction of the court below was under 28 U.S.C. 1332(d)(2). Plaintiff is incorporated under the laws of German and pleads on behalf of approximately 2,000 shareholders of SKW, which is a German company. Defendant Opta Group is a Delaware limited liability company with its principal office in New York City. This appeal is timely because an amended notice of appeal was docketed on June 27, 2024 [138], within thirty days of the decision and order, which was docketed on June 18, 2024 [124]. [A18]

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291, because MCGM appeals from a decision of the district court granting the moving defendants' motion to dismiss the Fourth Amended Complaint for failure to state a claim and subsequently dismissing without prejudice the remaining (non-moving) defendants, notwithstanding no judgment was entered. See In *FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.*, 498 U.S. 269, 276 (1991), explaining when Rule 4(a)(2) is applied a notice of appeal sought review of a nonfinal decision "would be appealable if immediately followed by the entry of judgment"; *Outlaw v. Airtech Air Conditioning & Heating, Inc.*, 412 F.3d 156, 158 (D.C. Cir. 2005).

In this case, the district court's non-final decision granting the motion to dismiss some but not all defendants would be appealable if the district court had subsequently entered judgment under Federal Rule of Civil Procedure 54(b). Rule

54(b) permits district courts to direct entry of final judgment as to fewer than all parties if it determines there is no just reason for delay. Once the district court granted the motion to dismiss there would have been no reason to delay entry of judgment in favor of the dismissed defendants and the district court could have directed entry of judgment dismiss. *See id.* ("Here the nonfinal decision would have been appealable if followed by entry of judgment under Federal Rule of Civil Procedure 54(b), and accordingly we conclude that we have appellate jurisdiction."). See also *FirsTier Mortgage Co.*, 498 U.S. at 275 (Rule 4(a)(2) "permits a premature notice of appeal from" a non-final order "to relate forward to judgment and serve as an effective notice of appeal from the final judgment").

## STATEMENT OF ISSUES PRESENTED

1.  Whether the District Court erred in dismissing plaintiff's complaint for failure to properly plead a cause of action for conspiracy to commit fraud by Opta Group LLC and the other moving defendants acting in concert with Kay Michel as CEO of SKW.

2.  Whether the District Court erred in dismissing plaintiff's complaint for failure to properly plead a claim for promissory estoppel.

3.  Whether the District Court erred in dismissing plaintiff's complaint for failure to properly plead a claim for fraudulent conveyance.

4. Whether the District Court erred in dismissing plaintiff's complaint for failure to properly plead a claim for conversion.

## STATEMENT OF THE CASE

SKW Stahl-Metallurgie Holding AG was a German public company traded on the Frankfurt Stock Exchange and the world's largest supplier of chemical products used to manufacture steel. Cplt. ¶¶ 3-5. As of 2017, SKW had twenty two wholly owned and two partially owned subsidiaries. *Id*. ¶ 5. In 2017 SKW reported annual revenues of approximate € 230 million and operating EBITDA was € 9 million.[1] *Id.* ¶ 100. Business was good and expected to "be able to seize opportunities in its core market [and] increase EBITDA well above the guidance level." *Id.* In July 2018 SKW and its subsidiaries were valued by an expert with an operating value of €222.3 million and company value of €122.3 million. *Id.* ¶ 5, 112.

During that period of one year, defendant Opta Group and affiliate Speyside and principals received by SKW a net out-of-pocket cost of € 4 million, *Id.* ¶ 108, and shareholders received nothing. *Id.* ¶ 107.

---

[1] EBITDA is a measure of core profitability, determined by adding back to earnings interest, taxes, depreciation and amortization.

Opta Group and Speyside were able to consummate this cost-free freezeout because of a personal friendship between Kevin Daugherty, Speyside's principal, and Kay Michel, SKW's sole director and chief executive officer.

On August 16, 2016, Opta Group and Speyside signed a "Confidentialy Agreement", kept secret for two years, in the corporate names of a Canadian subsidiary recently purchased by Speyside called Opta Minerals Inc. and Michel signed for SKW ("August 2016 Agreement"). The subject was a transaction concerni"a potential transaction in relation to a business combination of the whole or parts of the parties (the 'Transaction' ').  [A319.]

The August 2016 Agreement was not disclosed to SKW's Supervisory Board[2] or its shareholders until after the "Transaction" was complete, and even then a court order was required.  The conflicts of interest arising from Michel's deal with Daugherty and Michel's breach of his fiduciary obligations to SKW and its shareholders permeated every step in consummation of the Transaction.

### A Company in Munich

SKW Stahl-Metallurgie Holding AG ("SKW") was a public company in Munich, Germany with shareholders and the shares were traded on the Frankfurt

---

[2] A "Supervisory Board" in German corporate practice is a representing the interests of shareholders in supervising management and have the power to remove a CEO. *Id.* ¶¶ 29, 115(c). The Executive Board has management authority, including the scheduling and cancelling of shareholder meetings. *Id.* ¶¶ 6, 31, 113.  In the case of SKW Michel was the sole member of the Executive Board.  *Id.*

Stock Exchange in Frankfurt, Germany. SKW was the world's largest supplier of chemical products necessary for the manufacturing of steel and steel products and had twenty two wholly owned and two partially owned subsidiaries.

In 2014, the company hired a Chief Executive Officer, Dr Kay Michel ("CEO" or "Michel") and he was the only director on the Executive Board. There also was a Supervisory Board of five shareholders with supervising rights over the Executive Board. CEO Michel – the Executive Board -- attended Supervisory Board meetings. [6, 31]

### The Rights of Shareholders

Corporate law in Germany requires public corporations to disclose all material financial and business information to shareholders and the public to protect them from fraud, violation of a fiduciary duty, conspiracy and other misconduct. [73] [A118-19]

The German Stock Corporation Act (AktG) requires shareholders to have up to date information about the management and financials of a company and SKW published monthly and issued statements on changes. Shareholders have the right to allow or reject capital proposals of management, to approve or discharge the CEO and to approve or discharge members of the Supervisory Board. An annual meeting is required for shareholders. The CEO may cancel the date for an annual meeting three times. [A-127-28]

See   https://www.gesetze-im-internet.de/englisch_aktg/englisch_aktg.html

German law also required disclosure all information concerning a shareholder meeting and all other disclosure reported and to comply with other regulations by the German Federal Financial Supervisory Authority.   [A128]  See https://www.bafin.de/EN/Aufsicht/BoersenMaerkte/Transparenz/Informationspflic hten_fuer_Emittenten/informationspflichten_fuer_emittenten_node_en.html

**CEO Michel and the shares which were not issued**

The Supervisory Board of SKW, appointed Michel CEO and Chairman of the Executive Board.  His experience was in handling complex financial problems and the first problem was an antitrust violation fine for EUR 13.3 million fine which cuts the company's capital in half.  Michel's cure was to ask the Supervisory Board's approval and the vote of the shareholders to authorize SKW to issue 6,544,930,000 new shares with subscription rights for the shareholders.  [A106-07]  The new shares were authorized in a vote on June 9, 2015, Michel never had the new shares issued, and that will become an issue two years later .  [A107]

**Fraud and Conspiracy**

On August 1, 2016, a member of the Supervisory Board, Dr. Olaf Marx, the managing director of SKW's largest shareholder, Plaintiff MCGM, withdrew to head of a group to put together a replacement for SKW's existing loan and capital.

He withdrawed because he otherwise would have had conflict of interest. The loan was to expire on January 31, 2017, eighteen months in the future.

The Supervisory Board and Michel too monitored how Marx was doing in meetings and exchanging letters. By July 2017 he had a group of financial firms to work with: Almamet GMBH, Ainring, Quirin PrivatBank. Monaco Resources Group, Metalcorp Group, Luxembourg, Millennium Venture Capital AG, and Robus Venture Capital. (Cplt. ¶ 72.)

On August 16, 2016, a second group was established under the August 16, 2016 Agreeement by CEO Michel and the head of Speyside Equity LLC ("Speyside"). Speyside was a private equity group with headquarters in Amherst, New York, and OPTA was a recently purchase.

On that date SKW CEO Michel and Speyside/OPTA Daugherty, head of Speyside signed an agreement for joining SKW and OPTA. That agreement and other agreements later were not disclosed to the shareholders, BaFin[3] (the SEC of Germany) or the public for more than two years.[4]

That date was the start of an conspiracy and fraud: two individuals signing for two companies agreeing to use Michel against the interest of the shareholders of the company and for the benefit of Michel himself and the Speyside/OPTA group where

---

[3] Federal Financial Supervisory Authority
[4] See Complaint ¶¶ 69, 70, 90, 91, 92. See Complaint ¶¶ 71, 73,74 (Security Trading Act), 75-76 (Stock Exchange), 77-78 (Prime Standard), 79.

Michel is in the position to transfer SKW ownership from the shareholders and to Speyside/OPTA.

Going ahead for a paragraph, the conspiracy and fraud won SKW, that was not clear from defendantsthe. In 2023, Speyside Equity published a news article on Article 30, 2023, "Speyside Completes Continuation Vehicle OPTA".[5] [A778-780] The article stated in part:

> **AMHERST, N.Y., Aug. 29, 2023 /PR Newswire/-- Speyside Equity Advisers ("Speyside") announced Friday, August 25th that it has completed a continuation vehicle transaction to support future growth initiatives of portfolio company, Opta Group LLC ("Opta" or the "Company") . . . .**
>
> **Speyside acquired Toronto-based Opta Minerals in 2016 and took the company private.**
>
> **Speyside acquired the debt of Munich-based SKW Metallurgie in 2017, and subsequently converted its position to equity and took the company private.**
>
> **In 2019, Speyside amalgamated SKW Metallurgie with Opta Minerals to form Opta Group LLC.**

**Keeping the Competition in the Dark – Robus Capital Management Limited ("Robus")**

---

[5] Defendant sent the district court a letter explaining that "amalgamated" companies may not be merged companies. [A781}

Robus is a financial company with the wherewithal alone to take care the loan and capital needs of SKW. Michel knew that because he had spent two years emailing, talking, going to meetings together with a Robus Managing Director.

Clearly, Robus was a known firm to Michel, and therefore know to Speyside. Robus wrote proposal on September 25, 2017, with a letter from Olaf Marx. [A702, 703-04]. The proposal was made together with the shareholders. [A699-701]

Robus is an "entrepreneurial asset management firm". The Managing Directors began "following in a proposal SKW AG's situation very closely since the fourth quarter of 2014" and into 2016. Robus writes that it was Robus that spent time in numerous conversations and email and meetings. Robus remarked that its assets were EUR 650 million and EUR 200 million in cash available. Robus remarks that he was not approached by one of banks in the Speyside deal which should have known to call them.

Robus had worked with Michel on SKW financial needs since 2014 and in July 2017, when Michel announced he had loan deal with Speyside for SKW, Robus asked why he was not encouraged to make a proposal. He got in touch with Olaf Marx, principal of plaintiff MCGM, the shareholder with the largest holdings, who aos was putting together a loan and capital to replace the current financing, and Robus and Marx agreed to work together on what was most important to the shareholders.

9

What was important was that Speyside proposed to trade about EUR 35 million for the loan for enough shares to force the shareholders out of the company. Robus put together a better capital deal, allowing the shareholders to keep their shares and stay in SKW. The proposal was not accepted.

He had followed SBW from the 4th quarter and wanted to put together a bond issue for SKW and he had meetings with Michel with a capital market bank in his office in Frankfurt on that funding. The syndicate was in place, but the bond issue was not pursued. He had conversations with Michel about financial restructuring to lower debt and increase equity and those conversations continued through 2016. (703-704) Robus complained on September 25, 2017 [A702, 703-04]. Robus complains that it was not approached, and it should have been involved. The proposal Robus offered to take over the "receivables" section of the syndicated loan which Speyside. (704-05) Robus set out a complete plan and his plan does **not** force the shareholders out of their company, stating:

> "[O]ur concept also does not provide for a squeeze-out of shareholders or a delisting of SKW AG from stock exchange trading as declaredly sought by Speyside and our concept also does not provide for a squeeze-out of shareholders or a delisting of SKW AG." (705)

## The Insolvency Proceedings

Michel knew that shareholders would be able to fund SKW. He was the CEO and on the Supervisory Board and Speyside would know too that alternate funding

was available. The shareholders had the authority to say no to Speyside's deal and fire Michel at the annual meeting scheduled for August 31, 2017. To prevent this, Michel canceled the meeting twice. German corporate rules forbid a company from rescheduling or cancelling an annual meeting a third time, so the only option to prevent the disapproval of the Speyside deal, and firing Michel by the shareholders, was to file for insolvency

## STANDARD OF APPELLATE REVIEW

This Court reviews the grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) *de novo*, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *IWA Forest Industry Pension Plan v. Textron*, 14 F.4th 141, 145 (2d Cir. 2021) (internal marks omitted). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 12(b)(6)), containing "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" (*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible if the complaint contains factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 239 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).

In deciding a motion to dismiss, the Court "must accept as true all of the factual allegations contained in a complaint." (*Iqbal*, 556 U.S. at 678 (citation omitted). It is well established in this Circuit that "[d]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Fat Brands v. Ramjeet*, 75 F.4ᵗʰ 118, 125 (2d Cir 2023), *vacating in part and remanding* 2021 WL 37709, *quoting Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

Plaintiff alleges that individuals and companies acted as co-conspirators to defraud SKW shareholders of their ownership of a public company, taking control for the benefit of the conspiracy. [A21-29] One conspirator was the CEO of SKW. He abandoned his fiduciary duties and loyalty to the shareholders for self-dealing, He entered into nondisclosure confidentiality agreements with the individuals and companies of a private equity group, co-conspirators Speyside Equity LLC, its principal Michael Daugherty, and its subsidiary Opta Group LLC , to acquire SKW, thereby imposing fiduciary duties of all co-conspirators. See United States v. Chow, 993 F.3d 125, 136-37 (2d Cir. 2021);

## SUMMARY OF THE ARGUMENT

The fundamental facts of this case are not disputable. SKW's chief executive officer and the principal of an American private equity firm (through its subsidiary Opta Group LLC) engineered Opta Group's acquisition of a € 120 million company

for an out-of-pocket cost of € 4 million, and plaintiff and its fellow shareholders were frozen out of their company and suffered the complete loss of their investment. Ownership of the company now rests with Opta in New York City, and this action against Opta commenced here. Plaintiff has properly pleaded four causes of action to seek, for itself and its shareholders, compensation for their losses.

1. <u>Fraud against Co-Conspirators.</u> Conspiracy to defraud is properly pleaded because plaintiffs have pleaded misrepresentations made with knowledge of their falsity and intent to induce reliance, pleading with the heightened particularity required by Rule 9 of the Federal Rules of Civil Procedure and noting the context in which the statements were made. The complaint pleaded factual content that permits a court to draw a reasonable inference of liability, and dismissal was reversible error.

2. <u>Promissory Estoppel.</u> Plaintiff's claim for promissory estoppel pleads defendants' clear and unambiguous promises on which plaintiff and fellow shareholders reasonably relied. The complaint pleads specific statements by the chief executive officer of their company, working in league with Opta, intended to induce reliance by the shareholders that their interests would be protected.

3. <u>Fraudulent Conveyance.</u> Plaintiff's fraudulent conveyance claim properly pleads the transfer to Opta of ownership of a company valued at € 120 million when shareholders received nothing. The district court erred in the issue of fair consideration on a motion to dismiss .

13

4. <u>Conversion.</u> Plaintiff properly pleaded a claim for conversion. Opta Group took control of, and now the dominion and control over property plaintiff and the other shareholders, taken in violation of law.

**ARGUMENT**

**1. Plaintiff Properly Pleaded Fraud Against SKW's Management and Opta as Co-Conspirators**

**a. Pleading Rules**

The elements of a fraud claim in New York are (i) a misrepresentation of fact or an omission of a material fact by a party with a duty to disclose, with (ii) knowledge of its falsity and (iii) intent to induce reliance by another party, and (iv) reliance by that party justified in the circumstances, and (v) damages. *Eurycleia Partners v. Seward & Kissel*, 12 N.Y.3d 553, 559 (2009); *City of Long Beach v. Agostisi*, 220 A.D.3d 776, 778 (2d Dep't 2023) (citing *Eurycleia Partners*). Under Rule 9(b) of the Federal Rules of Civil Procedure, procedural rules, a claim of fraud must be pleased with "heightened particularity," specifying the statements that were made, by whom, where and when, and why they were fraudulent. *Abelar v. IBM (n re IBM Arb. Agmt. Litig.*, 76 F.4th 74, 87 (2d Cir. 2023). To extend liability to conspirators, New York law requires the complaint must allege the primary tort and an agreement between parties, an overt act in furtherance of the agreement, intentional participation in furtherance of a plan or purpose, and resulting damage. *Cohen Bros. Realty v. Mapes*, l181 A.D.3d 401, 404 (1lst Dep't 2020). The federal

14

procedural rules judge the adequacy of conspiracy allegations under the more liberal pleading standards of Rule 8(a). *Hecht v. Commerce Clearing House*, 897 F.2d 21, 26 n.4 (2d Cir. 1990).

### b. Primary Tort for the Conspiracy

The court below accepted ("assumes arguendo") "that the Complaint adequately alleges fraudulent conduct by Michel," SKW's sole director and CEO Kay Michel (A.__ - Decis. at 9), satisfying the requirement of a "primary tort" for a civil conspiracy. While the court did not further consider evidence of the fraud, a factual summary is warranted for this *de novo* review.

A central element of fraud perpetuated on plaintiff and its similarly situated shareholders started with the August 2016 Agreement. This is the agreement falsely denominated "Confidentiality Agreement" that declared the intent to plan a "Transaction" involving a business combination of the companies, which was signed by Daugherty, head of Speyside, for its Canadian subsidiary Opta Minerals Inc., [6] and Michel, head of SKW. See Complaint ¶¶ 70, 90, 91, 92. German law required a contract like that to be disclosed. See Complaint ¶¶ 71, 73,74 (Security Trading Act), 75-76 (Stock Exchange), 77-78 (Prime Standard), 79. However, this August 2016 Agreement was not disclosed until July 2017, and even then only after

---

[6] Speyside had two subsidiaries named Opta Minerals Inc., the Toronto-based company that was a party to the August 2016 Agreement described here and later "amalgamated" with SKW, and a Delaware company that was initially named as a defendant and later was dropped from the action.

a court ordered its disclosure. The concealment of this Agreement satisfies the first element of the fraud claim (*Long Beach v. Agostisi*, 220 A.D.3d at 778). Further, if Michel had disclosed his agreement to work with Daugherty and Opta, the conflict of interest would have met with objections by the shareholders and the Supervisory Board (of which Olar Marx, the principal of plaintiff, was a member, Cplt. ¶ 90) and likely forced his resignation – because under the Agreement he was committed to exploring with Daugherty and Opta Minerals a "business combination" (defined as the "Transaction") which Michel had no authority to explore. Michel's concealment of the agreement he had a duty to disclose, and Daugherty's and Opta's participation in that concealment, satisfies the reliance-related elements of the fraud pleading.

Michel instead stayed in his CEO position and participated as a member of the Supervisory Board of SKW without disclosing that he was working with Daugherty. The Supervisory Board was charged with monitoring Michel, who was the sole director and CEO, and protecting the interests of the shareholders. (Cplt. ¶¶ 29, 90.) The 2016 Agreement required secrecy, however, and no one knew about Daugherty's 2016 Agreement with Michel. Michel did not tell the Supervisory Board he was working for Speyside, Daugherty and the subsidiary Opta Group until July 2017. (Cplt. ¶90.) The members of the Supervisory Board were not provided with a copy until two years after it was concluded – and even then only after a Court Order required its disclosure.

### c. The Co-Conspirators

The court granted Defendants' Motion to Dismiss based on its erroneous finding that the Complaint "does not plausibly allege that any of the moving defendants entered into an agreement with Michel" to commit the fraud. The court erred by ignoring the context in which Michel's fraudulent statements, omissions and undertakings were made, context provided in part by the August 2016 Agreement. (Cplt. ¶¶ 7, 70.)

Opta Group LLC took over for Opta Minerals Inc. as a party to the August 2016 Agreement when Opta Group was formed by the "amalgamation" of Opta Minerals Inc. and SKW into Opta Group. In an August 29, 2023, press release (after the briefs on the Motion to Dismiss were completed), parent Speyside admitted:

> "Speyside acquired Toronto-based Opta Minerals in 2016 and took the company private. Speyside acquired the debt of Munich-based SKW Metallurgie in 2017, and subsequently converted its position to equity and took the company private. In 2019, Speyside amalgamated SKW Metallurgie with Opta Minerals to form Opta Group LLC. Since the completion of the amalgamation, Speyside has guided the company through integration and restructuring to set up the business as a strong platform for future growth."

The existence of this August 2016 Agreement, which was not disclosed to SKW's shareholders for over one year, explains why Michel refused to proceed with shareholder-approved plans to raise equity funds from the shareholders. He was acting pursuant to his Agreement with Daugherty and Opta to convey the company to them. In doing so he was in breach of his obligations to SKW's shareholders, who

17

as shareholders were "the source of the nonpublic information," and his co-conspirators share that responsibility by receiving the benefit of the breach with knowledge of the breach. *See United States v. O'Hagan*, 521 U.S. 642, 652-56 (1997) (relationship of trust and confidence exists between shareholders and an insider with access to confidential information; insider breaches his duty when he provides information to co-conspirators for trading profits).

The district court treated this August 2016 Agreement as dealing with and permitting legally required disclosures as exceptions from the general confidentiality undertakings in the Agreement. (A.__ - Decision at 10-11.) However, but the court inexplicably ignored the critical purpose of the Agreement, stated in its opening paragraph, which was "the Transaction," defined as "a business combination of the whole or parts of the parties." Daugherty's and Opta Group's relationship with Michel was kept from the shareholders and the Supervisory Board, in violation of SKW's disclosure obligations. It also explains (i) why Michel, acting in league with Daugherty and Opta, arranged the sale of SKW to Daugherty's company Opta Group (through a European subsidiary) instead of the transactions proposed by plaintiff and shareholders that would have preserved shareholder value, and (ii) why, when Michel determined *and acknowledged* that he could not get shareholder approval for the Transaction with Opta and Daugherty, put SKW into insolvency proceedings so they could close their deal with him.

18

This Agreement more than plausible but *explicitly so* , a contemplated "business combination of the whole or parts of the parties" (which the Agreement defined as the "Transaction"). Michel's acts jointly with Opta, after signing the Agreement, included developing the term sheet prior to disclosing the Agreement (*Id.* ¶¶ 104, 108, 129(b)), consenting to Opta Group's purchase of the SKW's indebtedness at a discount (*Id.* ¶¶19, 25, 129(a)), Michel's refusing to consider other financing and investment offers that would have preserved shareholder value (*Id.* ¶¶ 71-72, 91, 93, 97-99, 109), Michel's putting SKW into insolvency to consummate the deal with Opta and "as a way of getting rid of the Shareholders" (*Id.* ¶¶ 21, 106-08) – all of these actions satisfy the elements of pleading conspiracy: agreement, overt acts and intentional participation in furtherance of the plan.

The finding of the court below that the Complaint did not "plausibly allege" an agreement between the moving defendants and Michel to commit an act of fraud is equally inexplicable. The absence of a document containing a statement equivalent to "We intend and agree to squeeze out SKW's shareholders without paying them" does not warrant dismissal for lack of plausible allegations. The complaint's allegations are to be "accepted as true [with] all inferences are drawn in the plaintiff's favor" (*Littlejohn v. City of New York*, 795 F.3d 297, 306-07 (2d Cir. 2015)). Plaintiff's allegations in the Complaint should have been considered in the context of the August 2016 Agreement and with inferences drawn in plaintiff's

19

favor. Plaintiff has pleaded the primary tort and the actions sufficient for a cause of action against the co-conspirators of the fraud.

### d. Fraudulent Statements

The complaint alleges Michel's statements assuring plaintiff and other SKW shareholders that any plan for raising funds would provide an opportunity to them to invest more money into SKW. Cplt. ¶¶ 81-88. The complaint also alleges that concurrently (i) Opta Group concluded its undisclosed agreement with SKW, (ii) an agreement that Michel executed without authorization or disclosure, (iii) which acknowledged "proposed strategic discussions between [Opta Group and SKW] … in relation to a business combination," (iv) a business combination that was consummated within a year of the undisclosed agreement, and (v) that combination denied plaintiff and the other SKQ shareholders any opportunity to invest, and (vi) deprived them of their equity with no compensation. (Cplt. ¶¶ 7, 92.)

The complaint alleges additional facts that provide the context for establishing how Michel, after being induced into the August 2016 Agreement with Daugherty and Opta Group, betrayed the interests of SKW's shareholders. In 2015 SKW's Chief Financial Officer had explained that SKW would have to strengthen its equity base and accelerate growth both in traditional markets as well as in in emerging countries such as India, and the company was going to be "evaluat[ing] the capital markets regarding opportunities for equity capital measures during the further course

of 2015." (Cplt. ¶ 12.) Michel negotiated a bank loan of € 74m (Cplt. ¶ 11), but stressed to the shareholders that, while the bank loan stabilized SKW's financial situation, an increase in capital was needed for SKW's further development (Cplt. ¶ 13). The bank loan was "headroom" for "possible capital measures." (*Id.*)

Michel followed this statement with an April 23, 2015, notice to shareholders that, at the Annual General Meeting scheduled for less than two months later (June 9), he was going to request shareholders to authorize the issuance of additional equity shares. He further indicated that he had solicited and obtained approval of the Supervisory Board to solicit shareholder approval of his proposal to raise SKW's subscribed capital by up to € 6,544,930 "with subscription rights for shareholders." (Cplt. ¶ 14.) Michel solicited *and obtained* shareholder approval, in part by assuring the shareholders that the capital increase would be achieved with shareholders' subscription rights being protected. (Cplt. ¶¶ 14-15.) Plaintiff's testimony is material to the factual finding of whether this constituted an inducement to reliance.

Having solicited and obtained shareholder approval at SKW's regular annual meeting, Michel then proceeded to ignore the shareholder action. During the period from November 2015 to July 2017, Michel continued to assure shareholders that SKW would look to them for additional capital when needed (Cplt. ¶¶ 16-17). In fact, in May 2017 SKW reported to its shareholders that business was good, and the company's finances were sound and profitable. (Cplt. ¶¶ 100-01.) However, based

21

on the August 2016 Agreement, plaintiff alleged, on information and belief but with supporting evidence, that Michel and Opta were holding "proposed strategic discussions … concerning … a business combination of the whole or parts of the parties …."   The court below erroneously denied Plaintiff the opportunity to seek discovery and ultimately to present testimony regarding the agreement between Opta Group and Michel to consummate "a business combination."   But plaintiff should be permitted discovery on the following issues:

- The relationship between Opta's Daugherty and SKW's Michel, or the relationship between Opta and Michel, and whether such relationships permitted Daugherty and Opta to cause Michel to breach his duties to plaintiff and the other shareholders of SKW or create an appearance of impropriety that warranted disclosure.

- Opta's negotiations or agreements with third parties related to its planned takeover of SKW, including its agreements with SKW's banks to take over SKW's indebtedness, and the circumstances under which Michel provided SKW's consent to the assignment of the indebtedness (which was neither approved by the Supervisory Board nor disclosed to the shareholders).

- The time when Daugherty and Opta concluded an agreement with Michel under which SKW would issue new equity to Opta and eliminate the value of

the equity interests of plaintiff and SKW's other shareholders. (*See* Marx Decl., ¶ 7 & Ex. D.)

- The "due diligence" materials developed by Opta and its affiliates addressing the value of SKW (including any related information provided by Michel), and the plans developed to take over the company for a cash outlay of only € 4 million.

Plaintiff also pleaded and documented that just one year after the August 2016Agreement SKW and Speyside signed with SKW's banks (a) a loan agreement to take over the banks' loan (July 14, 2017), (b) a term sheet for Speyside's equity investment (July 21, 2017), and (c) a Subscription and Contribution for Speyside's investment in SKW (August 30, 2017), and a claim purchase and contract assumption agreement to close the transaction (Sept. 22, 2017). (Cplt. ¶ 129(a)-(d).)

Where, as here, an agreement between parties has been signed by Opta's principal Daugherty, with no denial by the parties of either the validity of the agreement nor the fact that they concealed it, and that agreement spells out a plan under which the signatories are to proceed with the business combination of their two companies, plausible allegations are pleaded. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The complaint's

23

allegations, *"accepted as true [with]all inferences are drawn in the plaintiff's favor" (Littlejohn v. City of New York, 795 F.3d 297, 306-07 (2d Cir. 2015)),* plead causes of action sufficiently to warrant discovery and a trial.

### 2. Plaintiff Properly Pleaded a Claim for Promissory Estoppel

Under New York law, a party claiming promissory estoppel is required to demonstrate that (a) a clear and unambiguous promise; (b) reasonable reliance on the promise by a party, and (c) injury caused by reliance on the promise. *Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 32 (1st Dep't 2015). The court below recognized, based on *Schroeder*, that reliance can be demonstrated, as it is here, by the plaintiff "refrain[ing] from doing something, in reliance" on an undertaking by the defendant. *Id.* at 12; *see Clifford R. Gray v. LeChase Constr. Svcs*, 31 A.D.3d 983, 987 (3d Dep't 2006) ("plaintiff refrained from working with other general contractors … in reliance on that alleged but ultimately unfulfilled promise").

The finding of the court below, that the Complaint "does not identify a clear, unambiguous promise" supporting a claim of promissory estoppel (A._- Decis at 12), is reversible error because it did not consider the statements made in the context in which they were made, and did not consider material concealed information that was necessary to make the statements made not misleading.

> Where a doubt exists as to the meaning of words, resort may be had to the surrounding facts and circumstances to determine the meaning intended. … If the language of a promise may be understood in more senses than one, it is

24

> to be interpreted in the sense in which the promisor had
> reason to believe it was understood.

*Maryanne McKeown (Frederick) v. Frederick*, 39 Misc.3d 1241(A), at *31-32. Plaintiff stated a claim for promissory estoppel on Michel assuring shareholders that they would be able to participate in any capital raising effort by SKW, and thereafter assuring shareholders that there there was no need to raise additional capital. The context in which these statements were made was Opta Group and persons associated with Opta and Speyside planning with Michel (i) to have SKW issue new shares to Opta and, (ii) when the SKW's shareholders made clear they would not agree to the decimation of their interest, putting the company into insolvency and giving it to Opta for nominal additional capital. Finally, the context for statements demonstrating the participation of Opta and Speyside is that, while they put up € 48 million to buy from its banks SKW's € 74 outstanding indebtedness, they got SKW to pay € 44 million for indebtedness with a face value of € 44, and to issue new equity for the remaining € 30 million. When the discount is factored into the transaction, the deal between Michel and Opta Group delivered SKW to them for an out-of-pocket cost of € 4 million. Cplt. ¶ 108(a)-(e). (SKW had refinanced and increased the syndicated loan in January 2015. It was to mature in January 2018.)

Further context is provided by SKW's responses to shareholders efforts to meet SKW's capital needs, which were to preserve the deal Opta and its principals developed with Michel. On August 1, 2016, Olaf Marx, principal of plaintiff,

25

delivered a letter of intent to SKW offering for MCGM, jointly with Quirin Bank, to replace part of the syndicated loan. Cplt. ¶ 91. On October 6, 2016, Marx delivered a second letter of intent bringing in two financial firms that were offering to guarantee they would purchase any new shares issued by SKW that were not purchased by existing shareholders, thereby guaranteeing the plan approved by shareholders the prior year (at the June 9, 2015 meeting) would in fact raise the needed capital for SKW. *Id.* ¶ 93. In March 2017 Marx brought Michel the financing proposal, which rested on existing shareholders purchasing new shares with subscription rights. *Id.* ¶¶ 97-99. There were also at least five other entities interested in funding or buying SKW. *Id.* ¶ 72.

During this same 2016-2017 period that Marx had brought to the company multiple prospects for increasing SKW's capital, Michel was completing implementation of the plan with his friend Kevin Daugherty for Daugherty to acquire SKW behind the shareholders' back. Opta and Daugherty caused SKW to enter into the Confidentiality Agreement on August 16, 2016. Daugherty's caused a recently-acquired Canadian company Opta Minerals Inc. to enter into the Confidentiality Agreement (Daugherty signed for Opta). The Agreement stated as its purpose that SKW and Opta would discuss planning "a potential transaction in relation to a business combination" between SKW and Opta Minerals the plans for which would be kept secret. *Id.* ¶¶ 7, 70, 92. That transaction is described above, with Opta taking

26

over SKW for a net out of pocket cost of € 4 million and SKW's shareholders losing 100 percent of their equity.

In the context of planning and consummating this transaction, SKW made the following statements to plaintiff and SKW's other shareholders:

- SKW stated in 2015-16 that it intended to raise additional capital with the shareholders having an opportunity to contribute. Cplt. ¶ 12-13.

- SKW June 9, 2015 annual meeting specifically solicited shareholder approval for raising capital promising that the effort would include "subscription rights for shareholders." Cplt. ¶ 14. As sole director and CEO of SKW, Michel was responsible for soliciting shareholder approval.

- In October 2015, Michel reversed himself, declining to proceed with issuing shares, even though SKW needed to increase capital. *Id.* ¶ 84. Michel provided assurances to SKW's shareholders in October 2015 that there was no economic need to raise capital. This was just a few months after had solicited and received shareholder approval to issue new shares. Cplt. ¶¶ 12-17. The explanation for this turn-around in Michel's position is likely to be the ongoing negotiations with Opta and its principals, formalized in the August 2016 Agreement.

27

- Between November 2015 and July 2017, Michel continued to assure shareholders that SKW would look to them for additional capital when needed (¶¶ 16-17).

- In May 2016, SKW published first quarter financials reporting positive earnings developments.  (*Id.* ¶ 88.)

- In September 2016, SKW published reassuring statements that SKW had "continuously positive cash flow," and expressing optimism that financing negotiations with the banks would be successful.  (Id. ¶ 89.)

- These assurances were given to shareholders after Daugherty and Opta had induced Michel to sign the 2016 Agreement in August of that year, and appear to have been intended to induce shareholder reliance not to act to raise capital until it was too late for the shareholders to put together the financing package that would have saved SKW and their investment in it.

- When it became clear that SKW's shareholders would not approve, Michel and Speyside, through Opta, put SKW into insolvency.  After assuring SKW's shareholders for two years that there was no need for additional capital, Michel now claimed the proceeding was necessary because of SKW's "over-indebtedness."  Cplt. ¶¶ 21-22, 108.

28

These representations induced shareholder reliance until it was too late for the shareholders to put together the financing package that would have saved SKW and their investment in it.

Just prior to Daugherty's and Michel's August 2016 Agreement to plan a "business combination," on August 1, 2016, Olaf Marx, principal of plaintiff, delivered a letter of intent to SKW offering for MCGM, jointly with Quirin Bank, to replace part of the syndicated loan. Cplt. ¶ 91. On October 6, 2016, Marx delivered a second letter of intent bringing in two financial firms that were offering to guarantee they would purchase any new shares issued by SKW that were not purchased by existing shareholders, thereby guaranteeing the plan approved by shareholders the prior year (at the June 9, 2015 meeting) would in fact raise the needed capital for SKW. *Id.* ¶ 93. Michel caused SKW to reject these offers, claiming that they were financially unsound. *Id.* ¶ 94. The proposals would have preserved the shareholders' equity. Michel and been better , while concealing that two months earlier he and Daugherty had caused Opta and SKW to sign the August 2016 Agreement committing them to explore "a business combination of the whole or parts of the" two companies – which ended up being the whole of the two companies.

In May 2017 SKW announced the general meeting scheduled in July 2017 would be delayed for the purpose of presenting a restructuring plan to Shareholders.

*Id.* Michel and Opta continued to conceal that they were working together to engineer Opta's takeover of SKW until wo months later, in July 2017, when Michel finally admitted that he was working for Speyside and its subsidiary Opta. *Id.* at 100-02.

May 24, 2017, consistent with all earlier reports, SKW AG reported business was so good that the company would "be able to seize opportunities in its core markets … able to increase EBITDA well above the guidance level … revenues approx. EUR 230 million and operating EBITDA EUR 9 million …." SKW AG further advised that business was so good that SKW AG announced the general meeting scheduled in July 2017 would be delayed for the purpose of presenting a restructuring plan to Shareholders. *Id.* ¶ 100. The existence of the agreement between Michel and Opta remained concealed until July, almost a full year after it was signed.

Events beginning with Michel's agreement with Opta and Daugherty, the date of which is uncertain without discovery but certainly no later than August 16, 2016 (the date of the August 2016 Agreement), demonstrate that Daugherty and Michel were developing a plan for a "business combination" for SKW that involved decimating the shareholders' equity. The assurances provided to and the facts concealed from SKW's shareholders during the two-year period prior to August 2017 induced the shareholders to believe that SKW was in good financial health that

raising capital was not necessary. These assurances and omissions constitute promissory estoppel.

Plaintiff's allegations do far more than "underscore its displeasure with Michel's management" (the patronizing phrase of the court below, A.__ - Decision at 13). They allege credible evidence of a concealed agreement pursuant to which Daugherty, Opta Group and Michel planned to freeze out Plaintiff and SKW's other shareholders, contrary to assurances to shareholders that induced them to refrain from taking action to protect their interests. On a motion to dismiss where a plaintiff's well-pleaded allegations are to be presumed true with inferences drawn in plaintiff's favor, the court made a improper finding of fact on a motion to dismiss, that the confidentiality agreement Plaintiff did "not identify a promise or detrimental reliance." (A.__ - Decis. at 14.) This crabbed view of the agreement and the provisions of the complaint describing it is unwarranted on a motion to dismiss. Plaintiff has adequately pleaded that Michel, pursuant to his undisclosed agreement with Daugherty and Opta Group, induced Plaintiff and other shareholders to rely on SKW's statements that a capital increase was not necessary, that shareholders would have an opportunity to participate in capital increases, and finally the ultimate betrayal of the shareholders' interests by misrepresenting that SKW was so "over-indebted" that insolvency was warranted, causing the shareholders to lose their entire

investment in SKW (and belied by statements just three months earlier that SKW was in a position "to seize opportunities in its core markets" (*id.* at ¶100).

Finally, the misrepresentations continued in July 2017, before issuing new shares to Speyside or a Speyside controlled company, when SKW announced that Speyside was going to refinance SKW's syndicated loan. (*Id.* ¶ 105.) A few weeks later SKW disclosed that Speyside would also purchase new shares issued by SKW, and would get rid of the Shareholders' ownership. *Id.* ¶ 138-39. On July 17, 2017, SKW announced that the share issuance to Speyside would be on the agenda for a shareholder vote at the annual meeting, which was adjourned to August 31. (*Id.* ¶ 106.) Then on August 25 SKW announced that the annual meeting was adjourned to October 10, 2017. (*Id.* ¶ 107.)

Then, when it became clear in August 2017 that the shareholders would not approve the proposal of Daugherty and Opta, Michel put SKW into an insolvency proceeding, based on the false representation that SKW had "to open insolvency proceedings for its assets due to over-indebtedness." This fictitious claim was made notwithstanding the assurances to shareholders since May 2016 that SKW's finances were sound. (Cplt. ¶¶ 21-23.) The 2016 Agreement confirms that Daugherty, Opta Group and Michel had this plan in place from August 16, 2016, but in the absence of discovery plaintiff cannot determine exactly when Daugherty induced Michel to agree to the sale of the company. [and breach his obligations to s/h's?] The

Complaint is clear, however, that there were alternatives to the insolvency proceeding that would have preserved the shareholders' equity, including six potential funders or purchasers. Cplt. ¶¶ 71-72.

Under New York law, a party claiming promissory estoppel is required to demonstrate that (a) a speaker made a clear and unambiguous promise; (b) it was reasonable and foreseeable for the party to whom the promise was made to rely upon the promise; (c) the person to whom the promise was made relied on the promise to his or her detriment, and (d) damages. (Cplt. ¶¶ 135-38.) Plaintiff properly pleaded a basis for a claim of promissory estoppel, and the court below improperly denied Plaintiff to prove the claim at trial.

### 3. Plaintiff Properly Pleaded a Claim for Fraudulent Conveyance

New York's fraudulent conveyance law, as in effect prior to 2020 (Article 10 of the Debtor and Creditor law), broadly defined "conveyance" to include the facts addressed in this action, where SKW conveyed all of its assets to Opta in exchange for only nominal consideration, thereby rendering SKW insolvent.

There is no question that SKW's assets were a "conveyance" for purposes of the Debtor and Creditor Law. Section 270 of Article 10 defined conveyance broadly to include:

> every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance.

33

Under section 276 of Article 10, a claim for an intentional fraudulent conveyance "must allege that (1) a transfer was made (2) with the actual intent to hinder, delay or defraud either present or future creditors." *Acacia Investments v. West End Equity I*, 2020 N.Y. Misc. LEXIS 686 (N.Y. Sup., N.Y. Co. 2018), at *8. Once again, *Eurycleia* is cited for the conclusion that intent may be "divined from the surrounding circumstances." *Id*. at *11, *citing Eurycleia Partners*, *supra*, 12 N.Y.3d 553. Unlike section 276, for constructive fraudulent conveyance under section 273 actual intent is irrelevant; the plaintiff must simply allege that a transfer was made without fair consideration and rendered the transfer insolvent. The distinction is not material in this case.

The financial structure of the transaction described above presents an issue for trial as to whether Opta paid fair consideration, Opta paid out of pocket only € 4 million for a company an expert said had an operating value of €222.3 million and a company value of €122.3 million just a few months later.

As decided in *Acacia Investments*, the issue of fair consideration was not appropriate for "determin[ation] at the pleading stage." Further, SKW said in May 2017 that it expected to "be able to seize opportunities in its core market [and] increase EBITDA well above the guidance level" in the following year (Cplt. ¶¶ 3-5), and for that company to be suddenly so "over-indebted" as to warrant being put into an insolvency proceeding just four months later strongly suggests that the transfers

34

were not made for fair consideration. The analysis and decision of the New York

Supreme Court (N.Y. Co.) is instructive:

> The [defendant entities in the position of Opta, charged
> with receiving fraudulent conveyances] do not dispute that
> DCD [the entity that made the conveyances] became
> insolvent. … Thus, the only question is whether the
> conveyances from DCD to the [defendant entities] were
> made for fair consideration. This is not a question that can
> be determined on the facts here at the pleading stage. For
> purposes of this motion, it is sufficient that [plaintiff]
> alleges that the [defendant entities] paid *no*
> *consideration* for DCD's assets and the [defendant
> entities] have not put forth any evidence to the contrary.
> The motion to dismiss the third cause of action for failure
> to state a claim, therefore, must be denied at this stage of
> the proceeding.

*Acacia Investments*, at *14-15.

Section 270 of the pre-2020 Debtor and Creditor Law (the Fraudulent

Conveyance Law) defines "creditor" broadly:

> "Creditor" is a person having any claim, whether matured or
> unmatured, liquidated or unliquidated, absolute, fixed or contingent.

As corporate shareholders, plaintiff and other shareholders of SKW are creditors

within the meaning of this broad definition. *Carbon Investment Partners v. Bressler*,

2021 U.S. Dist. LEXIS.166293 (SDNY 2021), at *29-30 (investors in limited

partnerhip hedge fund). The decision of the court below that the pleading "does not

plausibly describe a violation of section 274 by Opta or any other moving defendant"

failed to consider whether fair consideration was paid for Opta.

Finally, under the pre-2019 fraudulent conveyance law, a transferee who controls or is acting is in league with the transferor to defraud its creditors and who benefits from the conveyance can be held liable for the transfer. *BNHC 1703-518 v. Venari Partners*, 2024 N.Y. Misc. Lexis 4778 (N.Y. Co. 2024) at *11 (facts alleged sufficient facts to indicate that transferee defendant "exercised complete domination of the Nominal Defendants"). The conclusion of the court below that the Complaint does not allege whey Opta should be liable for the fraudulent conveyance (Decision at 16) is reversible error, or at least certainly premature at the state of a motion to dismiss.

### 4. Conversion Was Properly Pleaded

Five undisputed facts of this case relate to plaintiff's claim of conversion.

- at the beginning of 2017 SKW was a German publicly-held corporation (SKW Stahl-Metallurgie Holding AG), traded on the Frankfurt Stock Exchange, and approximately 2,000 shareholders owned the company (Cplt. ¶ 3),

- at the end of 2017 SKW was a company wholly-owned by the New York-based Opta Group through European subsidiaries (SKW Metallurgie Holding GmbH) (*id.* ¶ 111),

- the shareholders of SKW were told that the sale of their company to Opta Group and its parent company Speyside would be put to a vote at an annual meeting to be held on August 31, 2017, which meeting was then adjourned to

October 10, 2017, SKW was put into insolvency proceeding in order to avoid that shareolder vote (*id.* ¶¶ 105-08), and

- SKW's 2,000 shareholders received nothing when ownership of their company was taken from them and Opta Group because the sole owner (*id.* ¶ 110) .

As noted above, valuations of SKW were positive both a few months prior to and a few months after these events, but the CEO of SKW stated in the insolvency petition that at the time of the insolvency petition SKW was "over-indebted." (*Id.* at ¶¶ 21-22).

As the court below noted:

> A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession. Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and 2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.

*Colavito v, New York Organ Donor Network*, 8 N.Y.3d 43, 49-50 (2006) (citations omitted). The court below did not contest that ownership of a corporation is something that can be converted. "Conversion lies where the tortfeasor exercises unauthorized dominion over property belonging to another …." *dMY Sponsor v. Glatt*, 2024 N.Y. Misc. LEXIS 1622 (N.Y. Sup., N.Y. Co. 2024), at *12-13. While physical or electronic stock certificates are common evidence of ownership, at the

pleading stage allegations by a plaintiff claiming conversion that he is "an equitable and legal owner of the corporations" and defendants "have improperly prevented him from collecting his share of net profits" supported a claim for conversion notwithstanding the absence of stock certificates. *William Ng v. Steven Ng*, 2014 N.Y. Misc. 631 (N.Y. Sup., N.Y. Co. 2014), at *2-3, *5-6*9-10.

The court below concluded that an act of conversion can be laundered through the bankruptcy proceed misreads the *Dexter* case. *Dexter* did not involve an allegation of misrepresentation to the issuing court (in that case, regulatory authorities). To the contrary, the court in *Dexter* noted that "Plaintiff does not allege any cause of action based on fraud," and specifically recognized where "defendants were charged with fraud" and presented a "factual issue for trial" the result would be to the contrary. *Dexter*, 406.F.Supp.2d 260, 264 (2d Cir. 2005).

Similarly, *Calamia v. City of New York*, which contains the language quoted by the court below (at 17), recognized that the party claiming the privilege for acts pursuant to a court order, "has no such privilege when he has procured the order by means of an intentional misrepresentation to the issuing authority." *Calamia*, 879 F.2d 1025, 1031 (2d Cir. 1989). The order of the Munich insolvency court was issued based on the representations of insolvency and over-indebtedness that were belied by SKW's own statements before and after the proceeding.

38

What the court failed to consider are the facts that Michel, contractually in league with Opta and its principal Daugherty elected to put SKW into insolvency because they recognized the shareholder were not going to approve their plan to issue new shares to Opta and decimate the value of their equity. (Cplt. ¶¶ 105-08.) While they declared SKW to be "over-indebted," the statements released by SKW before and after the insolvency filing were to the contrary. In addition, the declared proposal of the third party to refinance SKW's obligations while preserving shareholder value also impeaches the declared reason for the insolvency filing.

Plaintiff's allegations properly stated a claim for conversion of his and the other shareholders' ownership of SKW.

### 5. Leave to Amend

The fundamental question presented to this Court is is whether the proponent of the pleading has a cause of action, not whether he has stated one" (*Leon v Martinez*, 84 NY2d 83, 88, 638 NE2d 511, 614 NYS2d 972 (1994). "In this circuit, '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'" *Leneau v. Ponte*, No. 16-CV-00776 (GHW), 2018 WL 566456, at *18 (SDNY 2018) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). "Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party." *Moniodes v. Autonomy Capital (Jersey) LP*, No. 20-CV-

05648 (GHW), 2021 WL 3605385, at *8 (S.D.N.Y. Aug. 11, 2021) (quoting *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)).

The fundamental fact here is that SKW's shareholders owned a valuable company and it was taken from them for no consideration by the secret machinations of their Chief Executive Officer and an American private equity firm that induced their Chief Executive Officer to betray his fiduciary obligations to them. Plaintiff and its co-shareholders deserve an opportunity to seek compensation for the company they lost.

## CONCLUSION

For the foregoing reasons, the decisions and orders of the Court below dated March 21 and June 18, 2024, should be reversed and the case should be remanded for further proceedings.

Dated: New York, New York
September 4, 2024

STAMELL & SCHAGER, LLP

By: /s/ Jared B. Stamell
Jared B. Stamell
stamell@ssnylaw.co
Richard J. Schager, Jr.
schager@ssnylaw.com
260 Madison Ave., FL 16
New York, New York 10016
Tel.: 212-566-4047
Fax: 212-566-4061

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 9,231 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word in Times New Roman, 14 point font.


Dated:        New York, New York
              September 4, 2024

                                  STAMELL & SCHAGER, LLP

                                  By:  /s/ Jared B. Stamell
                                       Jared B. Stamell
                                       stamell@ssnylaw.co
                                       Richard J. Schager, Jr.
                                       schager@ssnylaw.com
                                       260 Madison Ave., FL 16
                                       New York, New York 10016
                                       Tel.:  212-566-4047

**SPECIAL APPENDIX**

## <u>Table of Contents</u>

<u>Page</u>

Opinion and Order of the Honorable P. Kevin Castel,
    dated March 21, 2024 ................................................... SPA1

Order of the Honorable P. Kevin Castel, dated April 29, 2024 ........... SPA20

Opinion and Order of the Honorable P. Kevin Castel,
    dated June 18, 2024 ...................................................... SPA26

SPA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MCGM, GmbH,

                        Plaintiff,                          22-cv-5851 (PKC)

           -against-                    OPINION AND ORDER

OPTA GROUP LLC, SPEYSIDE EQUITY LLC,
SPEYSIDE EQUITY FUND LLP, KAY
MICHEL, KEVIN DAUGHERTY, JEFF STONE,
OLIVER MAIER, OPTA MINERALS, INC.,
SPEYSIDE PRIVATE FUND ADVISERS LLC,
SPEYSIDE PRIVATE FUND LLP, SPEYSIDE
EQUITY 1 LP and JOHN AND JANE DOE 1-99,

                      Defendants.
-----------------------------------------------------------x

CASTEL, Senior District Judge.

        In a Fourth Amended Complaint (the "Complaint"), plaintiff MCGM GmbH, a

shareholder of SKW Stahl-Metallurgie Holding AG ("SKW"), brings claims of conspiracy to

commit common law fraud, promissory estoppel, "conveyance without consideration" and

conversion against eleven named defendants or entities and 99 Doe defendants.  The action was

commenced in Supreme Court, New York County and removed to this Court by defendants

invoking subject matter jurisdiction premised on the Class Action Fairness Act ("CAFA").  28

U.S.C. § 1332(d).

        Five of the defendants, OPTA Group LLC, OPTA Minerals Inc., Speyside Equity

Fund 1 LP, Jeffrey Stone and Oliver Maier, move to dismiss the Complaint for failure to state a

claim.  The moving defendants, excluding OPTA Group LLC, also move to dismiss for lack of

personal jurisdiction.

The Complaint describes the purported malfeasance of defendant Kay Michel, a former CEO of SKW who allegedly failed to address the company's funding needs and drove it to insolvency.  Michel, according to the Complaint, "lives in Germany beyond the jurisdiction of this federal court."  (Compl't ¶ 53(f).)  A court in Munich, Germany presided over insolvency proceedings for SKW, adopted an insolvency plan that described SKW's shares as "economically worthless" and directed "an uncompensated compulsory transfer of shares" to an entity that is not a party to this action.

Because the Complaint does not plausibly allege a claim for relief against any of the moving defendants, their motion to dismiss for failure to state a claim will be granted.  The Court need not reach the issue of personal jurisdiction.

BACKGROUND.

Non-party SKW was a German public company with approximately 2,000 shareholders, whose shares traded on the Frankfurt Stock Exchange.  (Compl't ¶ 3.)  SKW had 24 subsidiaries and was the world's largest supplier of chemical products used to manufacture steel.  (Compl't ¶¶ 4-5.)  As of July 2018, its operating value was EUR 222.3 million.  (Compl't ¶ 5.)

Plaintiff MCGM was SKW's largest shareholder, with 2.5% of the Company's shares.  (Compl't ¶ 27.)  According to MCGM, defendant Michel used his authority as SKW's Chief Executive Officer to secretly arrange for the acquisition of SKW by defendant Speyside Equity, LLC ("Speyside"), a private-equity firm managed by Michel's personal friend, defendant Kevin Daugherty.  (Compl't ¶¶ 6-8.)  The Complaint alleges that after SKW took out a three-year loan of EUR 84,000,000 in 2015 (the "2015 Loan"), Michel failed to adequately maintain the Company's cashflow or arrange for the loan's refinancing, and instead pursued secret

negotiations to sell SKW to Speyside.  (Compl't ¶¶ 80-102.)  During this time, SKW's public

statements allegedly misrepresented the strength of the Company's finances and failed to

disclose SKW's negotiations with Speyside.  (See id.)

On July 20, 2017, SKW announced that the lenders on the 2015 Loan had agreed

to assign the loan to defendant Speyside Private Fund Advisers LLC, a "sister company" of

Speyside, and that the Company would exchange the loan in a debt-to-equity swap that plaintiff

asserts "squeez[ed]" existing shareholders out of ownership.  (Compl't ¶¶ 103-05, 108.)

According to the Complaint, the transaction occurred even though SKW had other options for

refinancing the 2015 Loan and meeting the company's cashflow needs, including through a

proposal made by MCGM and an aborted 2015 plan to increase liquidity by issuing new shares

to existing shareholders.  (Compl't ¶¶ 83-84, 93-94, 97-99.)

The Complaint acknowledges that the transaction between SKW and a Speyside

entity occurred pursuant to an insolvency plan ordered by a court in Munich, Germany.  In

September 2017, SKW "open[ed] insolvency proceedings for its assets due to over-

indebtedness." (Compl't ¶ 21.)  Insolvency proceedings occurred in the Insolvency Division of

the District Court of Munich, Germany.  (ECF 65-1.)  The German court issued a 17-page,

single-spaced opinion that observed that "[t]he insolvency plan . . . provides for an

uncompensated compulsory transfer of the shares to the investor Speyside S.à.r.l. by way of the

securities transaction clearing system and an exclusion of the right of the existing shareholders to

subscribe to the newly issued shares of the Debtor." (Id. at p. 11.)  "The shares of the previous

shareholders must . . . be regarded as economically worthless in the insolvency plan procedure

and valued at EUR 0.00 per share." (Id.)  The German court stated that "the insolvency of the

holding company threatens to infect the subsidiaries, which would lead to a further deterioration

of the enterprise value" and described the insolvency plan's effect on shareholders such as

MCGM:

> The shareholders are therefore in all likelihood not placed in a worse
> position as a result of uncompensated transfer of their rights and
> claims resulting from the shareholding than the position in which
> they would be situated without the plan.   In both procedures
> (insolvency plan procedure and regular procedure), no payments to
> the shareholders are possible and are also not provided for under the
> law.

(Id.)[1]  The Complaint states that "[a]s a result of the insolvency plan, the Shareholders were

replaced with Speyside, and/or a Speyside affiliate and finally [SKW] was merged into [OPTA]

in New York."  (Compl't ¶ 24.)

    The Complaint brings four claims for relief.  Count One asserts "fraud against co-

conspirators," and asserts that "[a]t least ten persons and entities agreed to a transaction who

planned and were able to succeed to remove the Shareholders as owners of SKW AG."  (Compl't

¶¶ 124-33.)  Count Two asserts promissory estoppel "against Speyside or a Speyside controlled

company (for example, OPTA Group LLC) . . . ."  (Compl't ¶¶ 134-40.)  Count Three asserts

"conveyance without consideration" against Speyside and/or OPTA.  (Compl't ¶¶ 141-46.)

Count Four asserts a conversion claim against OPTA.  (Compl't ¶¶ 147-54.)

    While the Complaint includes some allegations describing OPTA's role in these

underlying events, the other four moving defendants are rarely mentioned.  Jeff Stone and Oliver

Maier are identified as members of Speyside's "Senior Team" who allegedly "controlled

Speyside and related affiliate companies."  (Compl't ¶ 33.)  Stone is alleged to be a managing

---

[1] A separate Order of the German court similarly observed: "The insolvency plan is intended to achieve a substantial
debt reduction of [SKW]. For this purpose, the insolvency plan stipulates that all shares in the corporation are
transferred to Speyside S.a.r.l. and that the capital stock, which is to be reduced to EUR 0 by way of simplified
capital reduction, is increased to EUR 1 million by way of a combined cash and in kind capital increase."  (ECF 65-
2, at p. 2.)

director of Speyside.  (Compl't ¶ 35.)  No title is given for Maier, who is identified as

"responsible for sourcing, executing, managing, and exiting investments" and a director of

unspecified Speyside portfolio companies.  (Compl't ¶ 36.)  OPTA Minerals, Inc. "was or is" a

corporation purchased by Speyside, allegedly for the purpose of later acquiring SKW.  (Compl't

¶ 38.)  Although it is not entirely clear from the Complaint, it appears that after OPTA Minerals,

Inc. acquired SKW, it became defendant OPTA.  (See Compl't ¶ 53(c)-(d).)  Speyside Equity 1

LP is described as follows:

> Defendant Speyside Equity Fund 1 LP ("Speyside Equity I")
> announced on February 2, 2016: "Speyside Equity Fund I LP (the
> "Fund") that it was fully funded." The Fund was described as a
> limited partnership which will invest $130 million funds raised by
> Speyside Private Fund to fund Speyside Equity projects.

(Compl't ¶ 45.)  According to the Complaint, Speyside Equity 1 LP entered into a confidentiality

agreement with OPTA Minerals in June 2015, and in April 2016, Speyside acquired OPTA

Minerals by "us[ing] its sister company, Speyside Equity 1, to own OPTA Minerals."  (Compl't

¶ 69.)  All of these defendants urge that the Complaint does not plausibly state a claim for relief

against them.

As noted, subject matter jurisdiction is premised on CAFA.  This action was

originally filed in the New York Supreme Court, New York County, and removed by OPTA.

(ECF 1.)  The Notice of Removal and the Complaint contain numerous legal errors about the

citizenship of limited liability companies, which "take[] the citizenship of all of [their]

members."  Agoliati v. Block 865 Lot 300 LLC, 2023 WL 405769, at *2 (2d Cir. Jan. 26, 2023)

(quotation marks omitted) (summary order).  However, CAFA requires only "minimal diversity,"

which is satisfied where "any member of a class of plaintiffs is . . . a citizen or subject of a

foreign state and any defendant is a citizen of a State . . . ."  28 U.S.C. § 1332(d)(2)(B).  The

Notice of Removal states that two putative class members are citizens of Austria.  (ECF 1 at ¶

16.)  The body of the then-operative complaint identified OPTA Minerals, Inc. as a defendant

incorporated in Delaware; no principal place of business was alleged.  (ECF 1-13 at ¶ 10.)

Notwithstanding the numerous defects in the parties' citizenship allegations, the Court concludes

that it had subject matter jurisdiction under CAFA at the time of removal based on the foreign

citizenship of two putative class members and the Delaware citizenship of a defendant.

MOTION TO DISMISS STANDARD.

       To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S.

544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or

conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678.

Instead, the court must examine only the well-pleaded factual allegations, if any, "and then

determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is

appropriate when 'it is clear from the face of the complaint, and matters of which the court may

take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global

Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco,

Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

       The parties' Rule 12(b)(6) submissions annex certain agreements and the

defendants also rely on the Orders of a German court that are provided in a certified translation.

"Documents that are attached to the complaint or incorporated in it by reference are deemed part

of the pleading and may be considered.  In addition, even if not attached or incorporated by

reference, a document upon which the complaint solely relies and which is integral to the

complaint may be considered.  Courts may also properly consider matters of which judicial

notice may be taken."  Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d

59, 64 n.4 (2d Cir. 2012) (citations, quotation marks and ellipsis omitted).  A court may properly

take judicial notice of a foreign court decision, including to establish the facts of the litigation

and the opinions stated therein, without assuming their truth.  Ermini v. Vittori, 758 F.3d 153,

156 n.2 (2d Cir. 2014); Atas v. New York Times Co., 2023 WL 5715617, at *3 (S.D.N.Y. Sept.

5, 2023) (Oetken, J.).  The Court may not properly consider a testimonial affidavit that makes

factual assertions without converting the motion into one for summary judgment.  See, e.g.,

Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000).  There is no need to catalog every

exhibit filed in connection with this motion, but the Court notes that it has considered a limited

number agreements, each of which is referenced in the Complaint, and two Orders of a German

court that are properly subject to judicial notice.

        As noted, four of the five defendants have moved to dismiss for lack of personal

jurisdiction.  Typically, where a defendant move for dismissal on jurisdictional grounds, a court

must decide the jurisdictional issue before addressing whether the complaint plausibly state a

claim for relief.  See In re Rationis Enterprises, Inc. of Panama, 261 F.3d 264, 267-68 (2d Cir.

2001); Chevron Corp. v. Naranjo, 667 F.3d 232, 247 n.17 (2d Cir. 2012) ("Ordinarily, [courts]

would address any challenge to personal jurisdiction prior to deciding the merits of the cause of

action.").  "However, in cases such as this one with multiple defendants – over some of whom

the court indisputably has personal jurisdiction – in which all defendants collectively challenge

the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to

the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the

personal jurisdictional claims made by some defendants.  This is particularly true when the

personal jurisdictional challenges are based on factual allegations that are, in this early posture, still under development." Id.

Here, OPTA does not dispute the Court's personal jurisdiction over it, and all defendants urge that the Complaint does not plausibly state a claim for relief against them. Because the Complaint does not plausibly state a claim for relief against any of the movants, the Court need not reach their arguments directed to personal jurisdiction.

DISCUSSION.

I.     ALL CLAIMS AGAINST OPTA MINERALS
       INC. ARE VOLUNTARILY DISMISSED.

In its response to defendants' motion, under the heading "Opta Minerals Inc. is Not Needed," MCGM states as follows: "Defendants intend to drop the full name of a company. Opta Minerals Inc. is not Opta Mineral Group LLC. Opta Minerals Inc. is dropped." (Pl. Mem. at 22.) The Court understands MCGM to be stating that it no longer will proceed with any claim against OPTA Minerals Inc.

All claims against OPTA Minerals Inc. will be dismissed with prejudice.

II.    THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE
       MOVANTS PARTICIPATED IN A CONSPIRACY TO DEFRAUD.

Count One is labeled as a claim of "Fraud Against Co-Conspirators." (Compl't ¶¶ 124-33.) It recites the legal elements for fraud and of civil conspiracy, and states, "At least ten persons and entities agreed to a transaction who planned and were able to succeed to remove the Shareholders as owners of SKW AG." (Compl't ¶¶ 125-27.) The Complaint asserts that because SKW was a public company in Germany, SKW and Michel had an obligation under German law to disclose four documents relating to Speyside's acquisition of SKW: two term sheets, a Subscription and Contribution Agreement entered into by SKW and Speyside, and an

- 8 -

agreement executed by SKW, Speyside and eight non-party entities.  (Compl't ¶¶ 128-29.)  It

states that Michel and Speyside withdrew SKW funds for their own use, and that Speyside's

acquisition of SKW was unnecessary because SKW had other options for refinancing the 2015

Loan.  (Compl't ¶¶ 130-33.)

   Under New York law, "[t]he elements of a cause of action for fraud require a

material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance,

justifiable reliance by the plaintiff and damages."  Eurycleia Partners, LP v. Seward & Kissel,

LLP, 12 N.Y.3d 553, 559 (2009).  "Where the claims are premised on allegations of fraud, the

allegations must satisfy the heightened particularity requirements of Rule 9(b) of the Federal

Rules of Civil Procedure."  In re IBM Arb. Agreement Litig., 76 F.4th 74, 87 (2d Cir. 2023)

(quotation marks omitted).  "[I]n order to comply with Rule 9(b), the complaint must: (1) specify

the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent."  Id.

(quotation marks omitted).

   "To establish a claim of civil conspiracy, the plaintiff must demonstrate the

primary tort, plus the following four elements: an agreement between two or more parties; an

overt act in furtherance of the agreement; the parties' intentional participation in the furtherance

of a plan or purpose; and resulting damage or injury."  Cohen Bros. Realty Corp. v. Mapes, 181

A.D.3d 401, 404 (1st Dep't 2020).  Conspiracy allegations are not scrutinized under Rule 9(b),

and instead are subject to Rule 8(a): "On its face, Rule 9(b) applies only to fraud or mistake, not

to conspiracy.  [The] pleading of a conspiracy, apart from the underlying acts of fraud, is

properly measured under the more liberal pleading requirements of Rule 8(a).  Even so, the

complaint must allege some factual basis for a finding of a conscious agreement among the

defendants." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 26 n.4 (2d Cir. 1990) (internal citations omitted).

      For the purposes of this motion, the Court assumes arguendo that the Complaint adequately alleges fraudulent conduct by Michel, but grants the motion to dismiss because it does not plausibly allege that any of the moving defendants entered into an agreement with Michel to commit an act of fraud.

      The fraud claim is focused on the actions of Michel, non-party SKW and Speyside, and specifically relates to Michel's purported obligations to disclose four agreements related to SKW and Speyside. (Compl't ¶¶ 124-33.) The Complaint's allegations about Stone and Maier are limited to their job titles and descriptions of their responsibilities contained on a Speyside website. (Compl't ¶¶ 33, 35-37.) The allegations related to Speyside Equity 1 LP describe background information about Speyside's acquisition of the now-dismissed OPTA Minerals. (Compl't ¶¶ 67, 69.) Drawing every reasonable inference in favor of MCGM, the Complaint does not plausibly allege an agreement by Stone, Maier or Speyside Equity 1 LP to conceal any information from MCGM or to evade Germany's disclosure laws.

      As to OPTA, the Complaint asserts that in August 2016, SKW and the now-dismissed OPTA Minerals entered into a confidentiality agreement "to keep secret the business combination with SKW AG, that is, merging with OPTA Minerals." (Compl't ¶ 92.) Assuming that MCGM is seeking to hold OPTA liable for the actions of its apparent predecessor, OPTA Minerals, this confidentiality provision provided that the agreement "shall not restrict any disclosure or retention by either Party required by law . . . ." (ECF 78-1, § 7.) The agreement, which has been submitted by MCGM, is properly considered on a Rule 12(b)(6) motion because it is incorporated by reference into the Complaint. See Garanti, 697 F.3d at 64 n.4. Rather than

supporting the plausibility of a purported conspiracy to defraud, the agreement reflects that

OPTA agreed to the disclosure of all information required by law.  The fraud claim centers on

the actions of Michel and his purported obligations under German law, and does not identify an

agreement with OPTA to evade a disclosure obligation.  See Cohen Bros., 181 A.D.3d at 404.

        The motion to dismiss Count One against the four moving defendants will be

granted.

III.    THE COMPLAINT DOES NOT ALLEGE A PROMISSORY ESTOPPEL
        CLAIM AGAINST ANY MOVING DEFENDANT.

        Count Two is labeled "Promissory Estoppel Against Speyside Controlled

Company," and asserts that Michel acted as an alter ego of either Speyside or a company

controlled by Speyside.  (Compl't ¶¶ 134-40.)  The Complaint asserts that in 2015, Michel told

SKW shareholders that the Company needed to increase capital, and asked shareholders to vote

"to increase capital by acquiring new shares."  (Compl't ¶ 136.)  The shareholders approved the

proposal, but Michel never offered new shares in the Company.  (Compl't ¶¶ 136-37.)  Michel

publicly stated that SKW would issue new shares as needed, but later announced that Speyside

would be refinancing the 2015 Loan, and that Speyside would purchase new SKW shares and

"get rid of the Shareholders' ownership."  (Compl't ¶¶ 137-38.)  The Complaint states: "Michel

was acting for himself and as alter ego of Speyside or a Speyside controlled company (for

example, OPTA Group LLC) and they are liable for damages to the Shareholders . . . ."

(Compl't ¶ 140.)

        "The elements of a claim for promissory estoppel are: (1) a promise that is

sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3)

injury caused by the reliance.  Detrimental reliance is an indispensable element of a promissory

estoppel claim, and a failure to adequately plead that element requires dismissal."  Schroeder v.

Pinterest Inc., 133 A.D.3d 12, 32 (1st Dep't 2015) (quotation marks and internal citations omitted). To allege detrimental reliance, the complaint must include facts "showing that plaintiffs did something, or refrained from doing something, in reliance" on the defendant's promise. Id.

The Complaint does not identify a clear and unambiguous promise by Michel or detrimental reliance by MCGM. The Complaint asserts that in April 2015, Michel "proposed to increase the capital of [SKW] by doubling the outstanding [SKW] shares . . . and issuing the new shares for shareholders to buy." (Compl't ¶¶ 14, 83.) The shareholders voted to approve the proposal on June 9, 2015. (Compl't ¶ 15.) In October 2015, Michel "reversed" the proposal, stating that there was no need for an increase of capital. (Compl't ¶¶ 16-17, 84.) Later, in December 2016, "SKW told Shareholders" that it expected to increase cash in 2017 "by taking advantage of the subscription rights for the Shareholders" and would present a motion at a general meeting. (Compl't ¶ 96.)

In response to defendants' motion, MCGM states, "First, asking, proposing, requesting and there may be other words, probably in German, for a company to start the process for issuing shares and raising capital. It is a promise because Michel has the right to schedule a meeting, although if Michel will not schedule, the shareholders could get a court to order one. Michel followed these practices to June 2015." (Opp. Mem. at 25.) Michel's purported "right" to schedule a shareholder meeting is not a promise to that he would do so. MCGM also points to Michel's decision of October 2015, stating that "no shares were issued and instead of issuing shares, Speyside advised Michel on the acquisition of SKW, wanted SKW to use the over indebtedness to claim to an insolvency and renaming Speyside's debt as capital, a ploy to claim shares." (Id. at 25-26.) This argument does not identify a "clear and unambiguous" promise. As

- 12 -

to detrimental reliance, MCGM states, "Michael was managing by saying 'wait on issuing

shares'.  Later in 2017 there was no time to increase the capital by issuing the new shares as

Michel promised."  (Id. at 26.)

        MCGM's allegations and arguments in opposition underscore its displeasure with

Michel's management of the Company but they do not identify a promise or detrimental reliance.

The Complaint describes a proposal by Michel to raise capital for SKW by increasing the

number of Company shares and offering them for purchase by existing shareholders.  It does not

describe an express promise to undertake any course of action.  MCGM also does not describe

how it relied on any such a promise to its detriment.

        The claim is separately dismissed because it does not include facts that plausibly

allege that any Speyside-related entity was an alter ego of Michel.  "In order to state a claim for

alter-ego liability plaintiff is generally required to allege 'complete domination of the corporation

in respect to the transaction attacked' and 'that such domination was used to commit a fraud or

wrong against the plaintiff which resulted in plaintiff's injury.'"  Baby Phat Holding Co., LLC v.

Kellwood Co., 123 A.D.3d 405, 407 (1st Dep't 2014) (quoting Matter of Morris v. New York

State Dept. of Taxation & Fin., 82 N.Y.2d 135, 141 (1993)) (bracketed text omitted).  Plaintiffs

asserting alter-ego liability must allege "facts to support the conclusion that any domination or

control of defendant entities took place, who allegedly controlled these entities, and how such

control caused them damage."  S.M. v. Madura, 223 A.D.3d 486, 487 (1st Dep't 2024).

        "At the pleading stage, a plaintiff must do more than merely allege that

[defendant] engaged in improper acts or acted in 'bad faith' while representing the corporation.

The plaintiff must adequately allege the existence of a corporate obligation and that defendant

exercised complete domination and control over the corporation and abused the privilege of

doing business in the corporate form to perpetrate a wrong or injustice." Cortlandt St. Recovery Corp. v. Bonderman, 31 N.Y.3d 30, 47-48 (2018) (quotation marks and internal citations omitted). Relevant facts going toward an individual's domination and control over a corporation may include whether that individual pays the corporation's bills, purported to have a personal interest in the corporation, transferred corporate assets for personal use without consideration, exercised hiring and firing authority, and was an authorized signatory of the company's bank account. See Berisha v. 4042 E. Tremont Café Corp., 220 A.D.3d 608, 609 (1st Dep't 2023). Conclusory allegations of domination or control do not plausibly allege alter ego status. See, e.g., 245 E. 19 Realty LLC v. 245 E. 19th St. Parking LLC, 223 A.D.3d 604, 608 (1st Dep't 2024).

Drawing every reasonable inference in favor of MCGM, the Complaint does not make any allegation that would tend to show that Michel exercised domination and control over any Speyside entity. The Complaint alleges that Michel was a longtime friend of a Speyside managing director, defendant Daugherty. (Compl't ¶¶ 7, 34, 65.) It alleges that Speyside and Michel undertook "financial manipulation" to acquire SKW. (Compl't ¶ 108.) It also alleges that "[m]oney was withdrawn from [SKW] for Michel himself (between EUR 5 million to 10 million) . . . ." (Compl't ¶ 132.) Those allegations go toward actions that Michel undertook at the expense of SKW in order to benefit himself and entities controlled by a personal friend, but they do not go allege Michel's domination and control over a Speyside entity, including movants OPTA and Speyside Equity 1 LP.[2]

---

[2] MCGM's opposition memo appears to urge that because Michel executed certain agreements with Daugherty and others, the Complaint plausibly alleges alter ego status. (Opp. Mem. at 26 ("Michel is a movant, an individual who separately joined with Daugherty, an individual, and other individuals and corporations. Their names, individual and corporate, are in the contracts they signed. They are co-conspirators in a conspiracy.").) Without more, the assertion that various parties entered into one or more contract does not support the plausibility of alter ego status. MCGM also states that, contrary to the Complaint's allegations, "[a]lter ego is not the best phrase" and that the claim could instead be construed as sounding in conspiracy. (Id.)

Because the Complaint does not plausibly allege an express promise or detrimental reliance, or that any Speyside-related entity was under the domination and control of Michel, the moving defendants' motion to dismiss Count Two will be granted.

IV.   THE COMPLAINT DOES NOT ALLEGE "CONVEYANCE
       WITHOUT CONSIDERATION."

Count Three is headed "Conveyance without Consideration against Speyside and/or OPTA," and asserts that "[c]onveyances by persons in business made without fair consideration is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business transaction without regard to his actual intent." (Compl't ¶ 144.) It states: "SKW AG or its subsidiaries and/or elements of SKW AG have been conveyed by or caused by Speyside Equity LLC from Munich by Speyside Equity LLC and/or to OPTA Group LLC New York or others, have been conveyed where no fair consideration was given to the Shareholders." (Compl't ¶ 145.)

Defendants state that "conveyance without consideration" is not a recognized as a cause of action under New York law. They note that in a pre-motion letter, MCGM cited to the now-superseded version of section 274 of the New York Debtor and Creditor Law that was in effect when Speyside acquired SKW in 2018. (ECF 54 at 3.) Section 274, at the time of the transaction, provided: "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." N.Y. Debt. & Cred. Law § 274 (2010).[3] The express terms of section 274 apply to claims by creditors. See, e.g., Lippe v. Bairnco Corp., 99

_____

[3] This version of section 274 was superseded, effective April 4, 2020. See id.

- 15 -

Fed. App'x 274, 281 (2d Cir. 2004) ("under the DCL, a transfer may not be challenged as fraudulent unless it prejudices the complaining creditor.") (collecting cases).

      Neither the Complaint nor MCGM's opposition memo cites New York Debtor and Creditor Law. MCGM emphasizes that OPTA acquired SKW and that Michel pursued the transaction without first seeking shareholder approval. (Opp. Mem. at 27.) As support for its claim, MCGM relies solely on Thyroff v. Nationwide Mutual Insurance Co., 8 N.Y.3d 283, 291-92 (2007), quoting the following passage: "The time to recognize conversion of intangible property 'has arrived': It cannot be seriously disputed that society's reliance on computers and electronic data is substantial, if not essential. Computers and digital information are ubiquitous and pervade all aspects of business, financial and personal communication activities." Thyroff concluded that "the tort of conversion must keep pace with the contemporary realities of widespread computer use." Id. at 292. Thyroff has no apparent bearing, however, on this claim of "conveyance without consideration."

      The allegation about the underlying conveyance states that SKW was "conveyed by or caused by [Speyside] from Munich by [Speyside] and/or to [OPTA] New York or others . . . ." (Compl't ¶ 145.) Generously construing this allegation in the light most favorable to MCGM, it appears to assert that Speyside conveyed SKW to OPTA "or others" without adequate consideration, leaving Speyside with inadequate capital for its creditors. This allegation would go toward the conduct of Speyside and not OPTA or Speyside Equity 1 LP.

      Further, MCGM states in its opposition that it "received no value for SKW Holding, and SKW Holding is liable for the damages." (Opp. Mem. at 27.) But SKW is not a defendant, and the Complaint does not plausibly allege why OPTA or Speyside Equity 1 LP should be liable for this claim.

Generously construing Count Three to be a claim brought under the New York Debtor and Creditor Law, the Complaint does not plausibly describe a violation of section 274 by OPTA or any other moving defendant. The Complaint does not otherwise allege facts that plausibly state a claim for "conveyance without conversion." The motion to dismiss Count Three will be granted.

## V.    THE CONVERSION CLAIM WILL BE DISMISSED

Count Four is headed "Conversion by OPTA Group LLC Against OPTA Group LLC," and asserts "[p]laintiff has good reason to believe that [SKW] was merged into OPTA Group LLC notwithstanding Defendants' claim that there was no merger." (Compl't ¶ 148.) MCGM asserts that on July 1, 2022, it "demanded that OPTA (and all other Defendants) turn over all shares of stock and property to the Class because the rights of the Class Members are superior to any claims Speyside or OPTA Group may claim." (Compl't ¶ 151.) It asserts that OPTA now "controls the personal property" of SKW shareholders. (Compl't ¶ 152.)

"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession. Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50 (2006) (internal citations omitted).

"An act which would otherwise constitute conversion is privileged when it is committed pursuant to a court order valid on its face." Dexter v. Depository Tr. & Clearing Corp., 406 F. Supp. 2d 260, 265 (S.D.N.Y. 2005) (Lynch, J.) (citing Calamia v. City of New York, 879 F.2d 1025, 1031 (1989); Restatement (Second) of Torts § 266 (1965) ("One is

privileged to commit acts which would otherwise be . . . a conversion when he acts pursuant to a court order which is valid or fair on its face.")); <u>accord</u> <u>Weisman, Celler, Spett & Modlin v. Fein</u>, 225 A.D.2d 508, 508 (1st Dep't 1996) (conversion claim was properly dismissed when defendant acted pursuant to a court order).

      The Complaint acknowledges that SKW's shares fell under the control of Speyside as a result of the German court's insolvency plan: "As a result of the insolvency plan, the Shareholders were replaced with Speyside, and/or a Speyside affiliate . . . ." (Compl't ¶ 24.) The insolvency plan confirmed by the German court required the transfer of shares to an entity called Speyside S.a.r.l. (<u>See</u> ECF 65-1, -2.) Speyside S.a.r.l. is not a defendant and is not referenced in the Complaint, and the allegations of how OPTA ultimately came to own the SKW shares are murky. MCGM's opposition memo observes that the German court's decisions "cannot be appealed plus court [sic] did not allow the shareholders would [sic] defend themselves where its decision are and cannot be appealed." (Opp. Mem. at 29.) It is nevertheless the case that MCGM asserts that it was harmed because OPTA, via Speyside, came to own the shares of SKW, and that those shares came under the control of a Speyside entity pursuant to the order of a German court.

      Because the Complaint expressly acknowledges that "Speyside, and/or a Speyside affiliate" came to acquire MCGM's shares in SKW "[a]s a result of the insolvency plan," (Compl't ¶ 24) it does not plausibly allege a conversion claim against OPTA.

VI.    THE STATUS OF THE REMAINING DEFENDANTS.

      No appearance has been made on behalf of defendants Michel, Daugherty, Speyside Private Fund Advisers LLC and Speyside Private Fund LLP. It is not apparent from the docket whether these defendants have been served with process.

Separately, in the portion of the Complaint that purports to allege the Court's personal jurisdiction over the defendants, SKW states as follows: "Each Defendant below purposefully availed him/itself of the privilege of conducting business in New York or is 'at home' in New York . . . Michel lives in Germany beyond the jurisdiction of this federal court." (Compl't ¶ 53.)  This appears to be an acknowledgement that the Court does not have personal jurisdiction over defendant Michel.

Within 14 days, plaintiff shall file a letter-brief setting forth the date, time and circumstances of service of process on Michel, Daugherty, Speyside Private Fund Advisers LLC and Speyside Private Fund LLP, including compliance with Rules 4(*l*) and (m), Fed. R. Civ. P. Plaintiff shall also show cause in the same letter-brief why any defendant required to be served within the time limit set by Rule 4(m) but who has not been so served ought not be dismissed without prejudice.

CONCLUSION.

The motion to dismiss is GRANTED.  The Clerk is respectfully directed to terminate the motion and the related letter-motion.  (ECF 62, 86.)  Within 14 days, plaintiff shall file a letter-brief as directed above.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
March 21, 2024

- 19 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MCGM, GmbH,

                            Plaintiff,


                                                          22-cv-5851 (PKC)


            -against-                                      ORDER


OPTA GROUP LLC, SPEYSIDE EQUITY LLC,
SPEYSIDE EQUITY FUND LLP, JOHN AND
JANE DOE 1-99, KAY MICHEL, KEVIN
DAUGHERTY, JEFF STONE, OLIVER MAIER,
OPTA MINERALS, INC., SPEYSIDE PRIVATE
ADVISERS LLC, SPEYSIDE PRIVATE FUND
LLP, SPEYSIDE EQUITY 1 LP, and OLIVER
MAIER,

                            Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

            This Order dismisses plaintiff MCGM's claims against certain defendants based

on the failure to timely effectuate service of process pursuant to Rule 4(m), Fed. R. Civ. P.

            The Court's Opinion and Order of March 21, 2024 directed as follows:

            Within 14 days, plaintiff shall file a letter-brief setting forth the date,
            time and circumstances of service of process on Michel, Daugherty,
            Speyside Private Fund Advisers LLC and Speyside Private Fund
            LLP, including compliance with Rules 4(l) and (m), Fed. R. Civ. P.
            Plaintiff shall also show cause in the same letter-brief why any
            defendant required to be served within the time limit set by Rule
            4(m) but who has not been so served ought not be dismissed without
            prejudice.

(ECF 91 at 19.)  MCGM thereafter filed a letter-brief, and counsel to defendants OPTA Group

LLC, OPTA Inc., Speyside Equity Fund 1 LP, Jeffrey Stone and Oliver Maier responded.  (ECF

106, 113.)

        "The plaintiff is responsible for having the summons and complaint served within

the time allowed by Rule 4(m) . . . ."  Rule 4(c)(1), Fed. R. Civ. P.  "If a defendant is not served

within 90 days after the complaint is filed, the court—on motion or on its own after notice to the

plaintiff—must dismiss the action without prejudice against that defendant or order that service

be made within a specified time.  But if the plaintiff shows good cause for the failure, the court

must extend the time for service for an appropriate period."  Rule 4(m).  "'[A]ttorney neglect'

does not constitute good cause sufficient for an extension of the period to make service."

Harmon v. Bogart, 788 Fed. App'x 808, 809 (2d Cir. 2019) (summary order).  "[A] district court

may grant an extension in the absence of good cause, but it is not required to do so."  Zapata v.

City of New York, 502 F.3d 192, 197 (2d Cir. 2007) (emphasis in original).

        MCGM filed the Complaint in New York Supreme Court, New York County on

December 31, 2021.  (ECF 1-13.)  The case was removed by defendant OPTA Group LLC on

July 8, 2022, within 30 days of service being effectuated upon it.  (ECF 1.)  At that time, the only

defendants were OPTA Group, LLC, Speyside Equity LLC, Speyside Equity Fund LLP and John

and Jane Doe 1-99.  (ECF 1.)  An Amended Complaint filed on September 16, 2022 added the

following defendants: Kay Michel, Kevin Daugherty, Jeff Stone, Oliver Maier, OPTA Minerals,

Inc., Speyside Private Fund Advisers LLC, Speyside Private Fund LLP and Speyside Equity 1

LP.  (ECF 11.)  MCGM's 90-day period to effectuate service of process upon these new

defendants elapsed on December 15, 2022.  MCGM filed no extension requests and did not

- 2 -

otherwise advise the Court of any difficulties in attempting to effectuate service.  MCGM does

not now urge that it has good cause for its failure to timely serve any defendant.

       MCGM's claims against the following defendants will be dismissed without

prejudice because MCGM did not timely effectuate service of process upon them and because it

has not shown good cause for its failure to do so:

       Kay Michel.  MCGM acknowledges that it did not attempt to service process

upon Michel and states that he is beyond the Court's jurisdiction.  (ECF 106 at 1.)  MCGM does

not attempt to show good cause for its failure to effectuate service or request an extension of

time to do so.  All claims against Michel will be dismissed.

       Kevin Daugherty.  MCGM states that it attempted to effectuate service on

October 10, 2022 at his home address on East 86th Street in Manhattan.  (Id.)  "Doorman denied

that defendant resided at this address.  Plaintiff unable to locate defendant's new address."  (Id.)

MCGM does not attempt to show good cause for its failure to effectuate service or request an

extension of time to do so.  All claims against Daugherty will be dismissed.

       Speyside Private Fund Advisers LLC.  MCGM states that it attempted to

effectuate service on October 10, 2022 at an office building located in Brighton, Michigan.  (Id.)

"Building staff reported defendant no longer at that address and left no forwarding address."

MCGM does not attempt to show good cause for its failure to effectuate service or request an

extension of time to do so.  All claims against Speyside Private Fund Advisers LLC will be

dismissed.

       Speyside Private Fund LLP.[1]  MCGM states that it attempted to effectuate service

on October 17, 2022 at an address on East 86th Street in Manhattan.  (Id.)  "Process server

---

[1] This defendant is identified in plaintiff's pleadings as Speyside Private Fund LLP, but plaintiff's letter of April 13
refers to it as an LLC, apparently in error.

reported defendant unknown." (Id.) MCGM does not attempt to show good cause for its failure to effectuate service or request an extension of time to do so. All claims against Speyside Private Fund LLP will be dismissed.

        <u>Speyside Equity LLC.</u> Anthony B. Ullman of Dentons US LLP is listed on the docket as the attorney for Speyside Equity LLC.[2] In a letter of February 9, 2023, Mr. Ullman stated that the Rule 4(m) deadline to effectuate service upon Speyside Equity LLC expired on December 15, 2022. (ECF 38 at 2.) In a letter of April 10, 2023, Mr. Ullman again stated that service had not been effectuated upon Speyside Equity LLC and requested that the Court dismiss the claim against it <u>sua sponte</u>. (ECF 52 at 2.) MCGM did not respond to these arguments, either to assert that service had been effectuated or to request an extension. However, in its recent letter of April 17, 2024, MCGM now asserts that service was effectuated on Speyside Equity LLC through the Delaware Secretary of State on January 19, 2023, and annexes an affidavit of service reflecting the same. (ECF 106 at 2; 106-1.) Mr. Ullman notes that MCGM did not previously reference its claimed effectuation of service despite the issue having been raised twice in prior letter briefs. (ECF 113 at n.1.)

        Speyside Equity LLC was already a defendant at the time of removal (ECF 1-13) and the 90-day service period expired on October 6, 2022. MCGM does not attempt to show good cause for its failure to timely effectuate service upon Speyside Equity LLC.

        Separately, it does not appear that MCGM effectuated service upon Speyside Equity LLC consistent with Delaware law governing service of an LLC. In serving process upon

---

[2] Defendants' response letter is not submitted on behalf of Speyside Equity LLC and Speyside Equity Fund LLP. (ECF 113 at 1.) Mr. Ullman filed the Notice of Removal solely on behalf of OPTA Group LLC. (ECF 1.) Speyside Equity LLC and Speyside Equity Fund LLP were the only other two named defendants at the time of removal. (See id.) It is unclear to the Court whether the docket accurately reflects that Mr. Ullman is appearing for Speyside Equity LLC and Speyside Equity Fund LLP or whether it incorrectly associates him with these two defendants based on their status as defendants in this action at the time of removal.

# SPA24

an LLC, Delaware provides that "[s]ervice of process shall be effected by serving the registered agent (or, if there is none, the Secretary of State) . . . ." Del. Code tit. 6 § 18-109(b). "In the event service is made under this subsection upon the Secretary of State, the plaintiff shall pay to the Secretary of State the sum of $50 for the use of the State of Delaware . . . ." Id. MCGM makes no reference to the defendant's registered agent or to the payment of $50. Mr. Ullman's letter-brief notes that the registered agent of Speyside Equity LLC is easily identified through the State of Delaware and provides a web link. (ECF 113 at 5 n.2.) However, defendants "take no position herein as to the validity of that claimed service" (id. at 4 n.1) and the limited record and absence of legal argument prevents the Court from ruling intelligently on the issue.

The Court therefore relies only on MCGM's failure to serve Speyside Equity LLC within the time allotted by Rule 4(m) and the absence of good cause shown for the failure to effectuate service. All claims against Speyside Equity LLC will be dismissed.

Speyside Equity Fund LLP. Referring to Speyside Equity Fund LLP, Mr. Ullman's letter states that "[s]o far as we are aware, no entity of this name exists." (ECF 113 at 4.) Mr. Ullman has stated in previous letters that defendants are unaware of the existence of such an entity. (ECF 38 at 2 n.5; ECF 52 at 2 n.6.) The time to serve Speyside Equity Fund LLP elapsed on October 6, 2022. MCGM's later of April 13, 2024 makes no mention of Speyside Equity Fund LLP and no affidavit of service is filed to the docket. All claims against Speyside Equity Fund LLP will be dismissed.

CONCLUSION

Because they were not timely served with process pursuant to Rule 4(m) and because MCGM has not shown good cause for its failure to effectuate service, all claims against the following defendants are dismissed without prejudice: Kay Michel, Kevin Daugherty,

Speyside Private Fund Advisers LLC, Speyside Private Fund LLP, Speyside Equity LLC and

Speyside Equity Fund LLP.

     SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
     April 29, 2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MCGM, GmbH,

                    Plaintiff,                  22-cv-5851 (PKC)

        -against-                  OPINION AND ORDER

OPTA GROUP LLC, JEFF STONE, OLIVER
MAIER, OPTA MINERALS, INC., and
SPEYSIDE EQUITY 1 LP,

                    Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiff MCGM, GmbH ("MCGM") moves for reconsideration of the Court's

Opinion and Order dated March 21, 2024, which granted defendants' motion to dismiss the

Fourth Amended Complaint (the "Complaint").  MCGM, GmbH v. OPTA Grp. LLC, 2024 WL

1250629 (S.D.N.Y. Mar. 21, 2024) (the "Opinion").  Familiarity with the Opinion is assumed.

        As discussed in the Opinion, much of the Complaint describes acts of purported

corporate mismanagement by Kay Michel, a former CEO of SKW Stahl-Metallurgie Holding

AG ("SKW"), a German public company that is not a party to this action.  Although Michel was

named as a defendant, the Complaint acknowledges that he is "beyond the jurisdiction of this

federal court," and MCGM later conceded that service of process was never attempted upon him.

(See ECF 51, 106.)

        As detailed in the Opinion, the allegations concerning defendants OPTA Group

LLC, Jeff Stone, Oliver Maier, OPTA Minerals Inc. and Speyside Equity 1 LP were thin and

conclusory, sometimes offering little more than descriptions of their existence.  MCGM's motion

**SPA27**

for reconsideration sets forth no bases to depart from the reasoning of the Opinion and therefore will be denied.

BACKGROUND.

This action was originally filed in the Supreme Court of the State of New York, New York County, and removed pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). (ECF 1.)  The Complaint was the fifth iteration of MCGM's pleading and was filed after pre-motion practice.  (ECF 51.)  It describes purported mismanagement and malfeasance by Michel, who allegedly failed to obtain suitable refinancing for a EUR 74 million loan to SKW, and ultimately transferred the loan in a "debt-to-equity swap" to a private-equity firm allegedly owned and controlled by Michel's personal friend, Kevin Daugherty.  (See id.)  As described in the Complaint, the transaction had the effect of "squeezing" existing shareholders, including MCGM, out of their ownership of SKW.  (See id.)

The Complaint named eleven defendants, plus John and Jane Doe defendants 1-99.  (See id.)  Service of process was effectuated upon only five defendants: OPTA Group, LLC, Jeff Stone, Oliver Maier, OPTA Minerals, Inc. and Speyside Equity 1 LP.  Those five defendants moved to dismiss the Complaint pursuant to Rule 12(b)(6), and the Opinion granted that motion.

In a separate Order of April 29, 2024, the Court dismissed MCGM's claims against the six additional defendants pursuant to Rule 4(m), Fed. R. Civ. P., concluding that they had not been timely served and that MCGM had not shown good cause for its failure to do so. (ECF 116.)  MCGM does not move for reconsideration of that Order.

LEGAL STANDARD.

Motions for reconsideration are governed by Local Civil Rule 6.3 and Rule 60(b), Fed. R. Civ. P.  A motion for reconsideration may be granted based upon "an intervening change

# SPA28

of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atlantic Airways, Ltd. v. National Mediation Board, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks and citation omitted). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." Id.

Defendants urge that the motion should be denied as untimely because, after MCGM successfully applied for an extension, it filed the motion two days after the Court-ordered deadline. Defendants do not assert that they were prejudiced by MCGM's untimely filing, and the Court will consider the merits of MCGM's motion.

THE MOTION FOR RECONSIDERATION WILL BE DENIED.

### A. MCGM Does Not Identify Any Error in the Court's Application of the Plausibility Standard of Rule 12(b)(6).

MCGM first urges that its claims were "plausible from the start," citing to paragraphs of the Complaint that describe certain corporate-disclosure obligations under German law of non-party SKW. (Pl. Mem. at 3-4 (ECF 110).) But MCGM does not point to any allegations regarding the defendants' roles in SKW's claimed failures to adhere to German disclosure laws. It broadly references a "conspiracy" with the goal of "corrupting" Michel. (Id.) MCGM points to no allegations about any individual defendant's participation in such a conspiracy or explain how the Court misapplied the well-understood plausibility standard for adjudicating a Rule 12(b)(6) motion. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("The

plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.").

      MCGM has not identified any oversight or legal error in the Court's application of the plausibility standard, and its motion for reconsideration will be denied.

      B.  A German Appellate Court Dismissed Shareholder
          Objections to the Plan of Insolvency.

      Count Four of the Complaint asserts a conversion claim against OPTA Group LLC.  In dismissing the claim, the Opinion cited the Complaint's allegation that a Speyside entity acquired SKW shares "[a]s a result of the insolvency plan" adopted by the Insolvency Division of the District Court of Munich, Germany (the "Insolvency Division").  MCGM, 2024 WL 1250629, at *9 (quoting Compl't ¶ 24).  The Opinion excerpted portions of the Insolvency Division's written decision as submitted in certified English translation, including its conclusions that "no payments to the shareholders are possible" and that SKW's then-existing shares were "economically worthless."  Id. at *2 (quoting ECF 65-1).  Applying New York law, the Opinion concluded that, based upon the Complaint's allegations and the Insolvency Division's written decision, OPTA Group LLC was "privileged" against MCGM's conversion claim because any transfer of shares to a Speyside entity occurred pursuant to a court order.  Id. at *9 (collecting cases).

      Much of MCGM motion for reconsideration argues that the decision of the Insolvency Division was later reversed, and that Michel and a Speyside entity schemed to drive SKW to insolvency.  (Pl. Mem. at 4-5.)  This argument is expressly and fully contradicted by the text of the decision issued by the reviewing court of the Regional Court of Munich I – 14th Civil Division dated November 28, 2018 (the "Regional Court").  (ECF 65-2.)  It also is inconsistent with MCGM's briefing in opposition to the motion to dismiss.

- 4 -

First, MCGM's memorandum in opposition to the motion to dismiss asserted "that the German court's decisions 'cannot be appealed plus court [sic] did not allow the shareholders would [sic] defend themselves where its decision are and cannot be appealed.'" 2024 WL 1250629, at *9 (quoting Pl. Opp. Mem. at 29). While the verbiage is garbled, MCGM argued to this Court that the Insolvency Division's decision should not be given weight because SKW shareholders were unable to appeal it.

Second, MCGM now argues that "[b]ecause the [Insolvency Division] decision was reversed, the findings cannot be used to dismiss the Complaint." (Pl. Mem. at 4.) In fact, the Regional Court upheld the insolvency plan and dismissed an appeal by shareholders, including MCGM.

Because the Regional Court did not disturb the insolvency plan adopted by the Insolvency Division and its rulings were not disputed on the motion to dismiss, the Opinion did not discuss or summarize the Regional Court's decision. After the Insolvency Division issued its opinion on August 14, 2018, 154 petitioners, including MCGM, appealed the plan of insolvency. (See ECF 65-2 at 3.) Although the finer points of German procedure are not evident from the parties' submissions, an intermediate ruling thereafter issued by a "single justice of the chamber" in the form of a "proof decision" directed the appointment of a court-appointed expert to further review the plan of insolvency. (Id. at 3.)

That intermediate ruling was then reversed in a 12-page, single-spaced written decision issued by a three-justice panel of the Regional Court. (ECF 65-2.) The Regional Court upheld the insolvency plan and "rejected" the arguments of the petitioning shareholders. (See id.) The Regional Court stated that petitioners had not met their burden to identify "a serious violation of law," that two independent experts had already concluded that there was zero value

- 5 -

to SKW shares, that the "urgency" of "accelerated" proceedings precluded additional review by a court-appointed expert, and that various procedural objections raised by the petitioners did not warrant relief.  (<u>Id.</u> at 7-10.)  The Regional Court emphasized that the need to "promptly" effectuate the insolvency plan outweighed the benefits of a further review by a court-appointed expert and the attendant delays, pointing to the interests of SKW's creditors and employees.  (<u>Id.</u> at 11-13.)

MCGM's assertion that an appellate tribunal reversed the plan of insolvency is contradicted by the text of the Regional Court opinion and does not provide a basis to reconsider the Opinion.

> C.  MCGM's Other Asserted Grounds for Reconsideration Are
> <u>Conclusory and Unsupported by the Text of the Complaint.</u>

MCGM raises additional arguments in support of its motion for reconsideration, none of which merit relief.

Count One asserted a claim of "fraud against co-conspirators."  (Compl't ¶¶ 124-33.)  MCGM urges that it plausibly alleged that defendants acted as co-conspirators to Michel in some capacity.  (Pl. Mem. at 6-7.)  The allegations that it cites in support are overbroad and conclusory.  (<u>See</u>, <u>e.g.</u>, Compl't ¶ 43 ("Various companies, partnerships, and individuals made and not made defendants in this case participated as co-conspirators in the offenses alleged herein and performed acts and made statements in furtherance of a conspiracy.").)  This vague allegation does not satisfy the notice pleading required by Rule 8.

Also as to Count One, MCGM argues that it plausibly alleged fraudulent conduct based on the failure of Michel and SKW to satisfy German disclosure laws.  But the Opinion assumed <u>arguendo</u> that the Complaint adequately alleged fraudulent conduct by Michel and

concluded that it did not plausibly allege that any defendant entered into an agreement with Michel to fraudulently evade Germany's disclosure laws. 2024 WL 1250629, at *5.

Count Two asserted promissory estoppel "against Speyside controlled company."[1] The Opinion dismissed the claim because the Complaint failed to identify a clear and unambiguous promise by Michel, and, separately, because it did not plausibly allege that any defendant was an alter ego of Michel. Id. at *6-7. In moving for reconsideration, MCGM argues that Michel successfully "asked the shareholders" to approve issuing additional shares but did not adhere to the shareholder vote. (Pl. Mem. at 9.) This does not identify a promise by Michel and also does not go to the plausibility of any defendant's status as a purported alter ego of Michel.

In dismissing the "conveyance without consideration" claim asserted in Count Three, the Court generously construed it as an attempt to seek relief under the New York Debtor and Creditor Law, but concluded that the Complaint made no allegations about the involvement of the defendants, and noted the assertion in MCGM's memorandum that non-party SKW is liable for damages on this claim. 2024 WL 1250629, at *7-8. In moving for reconsideration, MCGM does little more than quote from statute and assert that SKW shareholders received "fraudulent" and "unreasonably small value" in the transaction with a Speyside entity. (Pl. Mem. 10.) For the reasons explained in the Opinion, this does not plausibly state a claim for relief.

Regarding its conversion claim, MCGM urges that even if shares were transferred from SKW to OPTA Group LLC pursuant to the insolvency plan ordered by the German courts,

---

[1] Five defendants named in the Complaint included "Speyside" in their name. The body of the Complaint often made no attempt to distinguish between and among Speyside entities.

# SPA33

its conversion claim should be actionable because it sounds in fraud.[2]  But the conversion claim

does not reference fraud and does not allege fraud with the particularity required of Rule 9(b),

Fed. R. Civ. P.

MCGM cites to New York authority on the law of replevin, but the Complaint

brought no claim for replevin.

The motion for reconsideration will be denied.

CONCLUSION.

The motion for reconsideration is DENIED and the Clerk is respectfully directed

to terminate the motion.  (ECF 107.)  The Clerk is also directed to terminate the gaveled motions

at ECF 108, 110, 111 and 112, which are plaintiff's memoranda of law and attorney declarations

that were erroneously filed as motions.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       June 18, 2024

---

[2] The insolvency plan provided for the uncompensated compulsory transfer of shares to an entity called Speyside S.a.r.l., which the Insolvency Division described as the only investor capable of continuing business operations and satisfying SKW's creditors.  (See ECF 65-1 at 14.)  The Complaint makes no mention of Speyside S.a.r.l. and alleges that OPTA Group LLC is the successor to SKW.  (Compl't ¶¶ 40-42.)